**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Daniel L. BALZANO,
Defendant–Appellant.**

**No. 87–2607.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1989.

Decided Oct. 30, 1990.

Anton R. Valukas, U.S. Atty., Steven Shobat, Asst. U.S. Atty., Office of U.S. Atty., Chicago, Ill., for plaintiff-appellee.

James W. Reilley, Reilley & Associates, Des Plaines, Ill., Dianne Ruthman, Chicago, Ill., for defendant-appellant.

Daniel L. Balzano, Park Ridge, Ill., pro se.

Before POSNER, COFFEY and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Daniel Balzano was charged in a grand jury's six-count superseding indictment with four counts of extortion in violation of 18 U.S.C. § 1951, one count of conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act (RICO) in contravention of 18 U.S.C. § 1962(d) and one count of threatening and intimidating a grand jury witness in violation of 18 U.S.C. § 1512. Following a jury trial commencing on June 2, 1987, Balzano was found guilty on three of the four counts of extortion, the RICO conspiracy count and the count of threatening and intimidating a grand jury witness. Balzano was sentenced to six months' imprisonment with work release privileges on the RICO conspiracy count and one of the extortion counts with the sentences to be served concurrently.

On the remaining two extortion counts and the count of threatening and intimidating a grand jury witness, Balzano received sentences of five years' probation to run concurrently with one another and consecutively with the work release term imposed on the other counts. As a condition of his probation, Balzano was required to perform 300 hours of community service. Balzano appeals his convictions. We affirm.

## I.

## FACTS

The City of Chicago's Fire Prevention Bureau is a unit of the Chicago Fire Department, responsible for the enforcement of the Chicago Fire Code including on-site investigation of property and the issuing of citations for violations of the Code.[1]

Daniel Balzano, a Chicago Fire Inspector in 1983–84, was charged with receiving payoffs from business enterprises that had applied for liquor, food and amusement licenses. Balzano, while assigned to the North Side Task Force, split payoffs with Richard Dorband, the Fire Prevention Bureau Inspector and supervisor of the North Side Task Force. On three other occasions Balzano got more greedy and rather than splitting the payoffs, shook down business license applicants himself without splitting the payoffs. Balzano would advise the business proprietors of the necessity to make the repairs indicated in order that they might comply with the Code and would then demand a "payoff" from the owners in lieu of or in addition to the repairs.

After a plea agreement Richard Dorband testified for the government with respect to the payoffs he split with Balzano. Dorband stated that during the year he worked with Balzano, he and Balzano received and split a number of small payoffs of approximately $20 on each occasion. He estimated that Balzano received a total of between $100 and $150 from these payoffs. Dorband was able to remember one large payoff from Woo Kim, the proprietor of the China Moon Restaurant. Dorband testified that on June 28, 1983, he received $500 from Kim, kept $100, gave $100 to Balzano, gave another $100 to a health inspector and returned the remaining $200.[2]

As noted above, there were also incidents where Balzano, on his own, demanded and/or received "payoffs" to facilitate the approval of the licenses. The first of these occasions involved the liquor license application of the Club Victoria nightclub. Upon completion of the initial inspection the premises were deemed "not ready,"[3] and Balzano arranged for a meeting with the Club's proprietors, Roy LaBolle and Jennifer Hammersmith. During the meeting, Balzano took Hammersmith on an inspection tour of the premises pointing out examples of non-compliance with the fire code. Hammersmith, while viewing one of the alleged defects, inquired of Balzano why she was now required to comply with the Code and the former owners were allowed to operate without conforming. Balzano told Hammersmith that "he could make me wallboard any part of the building that he wanted me to." Further, Balzano told Hammersmith that she would be required to have the work on her business

---

1. The Bureau performs inspections when complaints are received concerning suspected noncompliance with the Code and when a business applies for a license. Inspections were performed by inter-departmental task forces composed of inspectors from the Fire Prevention Bureau, the Consumer Services Department and the Department of Inspectional Services (including plumbing inspectors, ventilation inspectors and structural inspectors during the period in question—1983–84). The City of Chicago's task force inspections were divided into three separate areas, one for the north, one for the west, and one for the south side.

2. As will be discussed, *infra,* Dorband and Balzano also collaborated in the receipt of a bribe during the inspection of United Skates of America.

3. A "not ready" determination suggests that the proprietor is informally advised that the establishment is not in compliance with the relevant local codes, but does not result in the issuance of formal citations. The owners are permitted additional time to bring their establishment up to compliance, and a re-inspection is arranged for, upon request, after Code compliance has been completed.

performed by a craftsman Balzano recommended. When Hammersmith challenged Balzano on this point, Hammersmith testified that Balzano again told her that "he could make [her] do anything that he wanted to," and that if she failed to comply with his directions, her license application would not be approved. Further, Balzano advised her that she would be required to make a $2,500 cash payment to him in order to guarantee that Club Victoria would pass the next task force inspection. Complying with Balzano's demands, Hammersmith stated that she hired Guy Nowak to perform the work, on Balzano's recommendation, and made the $2,500 cash payoff to Balzano prior to the Club's reinspection. On January 20, 1983, Club Victoria passed the reinspection with Daniel Balzano appearing on the premises with the inspection team.

The next payoff incident was an application for a liquor license with a 2 a.m. closing time limit of the United Skates of America roller skating rink filed late in 1982. Tom Grisamore, general manager of the roller skating group, and Jim Dvorak, vice president of United Skates and Grisamore's superior, suggested that James Allenson, co-owner of their arcade machine supplier, be given $2,200 to pay off public officials to obtain the license. Allenson spoke with Terry Mofreh, an inspector from the City's Consumer Services Department, and explained that United Skates wanted a liquor license to help promote entertainment in their roller rink and asked Mofreh for his help in obtaining the liquor license. Mofreh told Allenson that he would get back to him and eventually told him that he could provide assistance at this time. Mofreh advised him that $1,500 would be required, and Allenson paid Mofreh the $1,500 in cash.

The North Side Task Force performed a liquor license inspection of the United Skates premises on February 17, 1983, with Terry Mofreh who, although not assigned to the inspection team, also appeared.

During the inspection, Mofreh approached Richard Dorband and told him that he was interested in seeing that United Skates passed the inspection. Dorband talked to Balzano and after their conference it was suggested to Mofreh that a contribution of $300 to the fireman's fund would help to gain approval. Allenson gave Mofreh an additional $300, and he turned the money over to Dorband.[4] After the inspection was completed, Mofreh told Allenson that everything was fine.

About a week after the task force's inspection of the United Skates premises, a fire inspector visited Tom Grisamore and identified himself as a member of the inspection team. Grisamore testified that he recognized the inspector as having visited the premises on an earlier occasion while a member of the inspection group. Grisamore described the inspector at trial as a "white male, dark hair, in his mid-twenties to thirties, youngish, five-nine to six feet [who] possibly had a mustache," a description matching Balzano. Grisamore also testified that the inspector was wearing a uniform. The inspector stated that the building premises license application had a problem since the establishment was without a sprinkling system. Grisamore complained the installation would cost about $100,000. In response, the fire inspector displayed an advertisement containing a picture of a video cassette recorder and a television and, in Grisamore's words, "indicated that if I could get this for the boys at the station house ... there wouldn't be any problem with the sprinkling system." Pursuant to Grisamore's request, the inspector wrote his name and telephone number on a piece of paper that was left with Grisamore. Although at the time of trial Grisamore was unable to positively I.D. Balzano, Allenson testified that he received a telephone call from Grisamore (after the extortion attempt) in which Grisamore referred to Dan Balzano as the fire inspector who had visited him at the time of the alleged

---

**4.** Richard Dorband presented a somewhat different version of the payoff. Dorband testified that Mofreh gave him $100 and that he told Mofreh that he had no control over the other inspectors. According to Dorband, Mofreh told him not to worry about it as Allenson had plenty of money and Mofreh would talk to all of the inspectors.

shakedown. When Allenson later met with Grisamore at United Skates, Grisamore gave Allenson a picture of the VCR and television from a newspaper he had received from the fire inspector along with a piece of paper with Balzano's name inscribed thereon. Allenson met with Terry Mofreh shortly thereafter who, at Allenson's request, confronted Balzano with the information concerning the attempted "shakedown." During this confrontation, Balzano did not deny the extortion attempt but told Mofreh that United Skates had promised him a video recorder.

Balzano's next payoff episode involved the liquor and food license applications of Eddie's Barbecue Ribs restaurant, owned by Cesar Aguilera. Two task force inspections were performed, and at the time of the second inspection Aguilera spoke with an individual wearing a fire inspector's uniform whose description matched that of Balzano: "a young person, about five-seven, about 150 pounds, white, kind of brown hair and a mustache." [5] Despite the fact that Aguilera had complied with the majority of the violations noted in the earlier inspection, the fire inspector told Aguilera that the ceiling still required fireproofing and the decorative wood needed to be fire retardant. When Aguilera asked the fire inspector for an estimate of the cost of the alterations, the inspector gave him a figure of some $50,000 or more. Aguilera became disgusted and asked how much a license would cost. A few hours later, the inspector returned, showed Aguilera a dollar figure amount inscribed on a piece of paper and suggested he call when he had the money.[6] Aguilera raised the funds in 24 hours and called the inspector. The next day he and the inspector met in the basement of the restaurant, and Aguilera turned over between $1,500 to $3,000 in cash. A few days later, Aguilera received approval of the license without the formality of an additional inspection.

Richard Dorband testified that he had two telephone conversations with Balzano in February 1985, in which they discussed Terry Mofreh's cooperating with the government. In June 1986 Terry Mofreh testified as a government witness before a grand jury. On one of the dates Mofreh was scheduled to appear, Mofreh was seated in a room adjoining and behind the grand jury room. Balzano, while present in the area of the grand jury room, walked to the doorway of the room where Mofreh was sitting. Gesturing toward Mofreh, Balzano waved a newspaper over his own mouth two or three times, moved his thumb across his own throat in a slashing motion, and pointed his index finger with his thumb extended in a motion representing the firing of a gun. FBI Agent Neal O'Malley, who came upon Mofreh very shortly thereafter, stated that Mofreh appeared pale as he described the gestures that the individual (Balzano) made. He further stated that at that time Mofreh was unaware of the name of the person who made the threatening gestures. Assistant United States Attorney Ira Raphaelson also testified that he had observed Mofreh immediately after O'Malley and confirmed that he also observed that Mofreh appeared pale.

Balzano's appeal raises the following contentions: (1) the trial court erred in permitting joinder of his witness intimidation count with the remaining counts of his indictment under Rule 8 of the Federal Rules of Criminal Procedure and in refusing to order the witness intimidation count to be severed for trial under Rule 14 of the Federal Rules of Criminal Procedure; (2) there was insufficient evidence to support his conviction for extortion, conspiracy to violate RICO and witness intimidation; and (3) he received constitutionally ineffective assistance from his trial counsel.

## II.

### JOINDER AND SEVERANCE

#### A. *Joinder*

Balzano challenges the joinder of his witness intimidation count with the re-

---

5. The Chicago Fire Department task force business records confirmed that Balzano was an inspector on each of the inspections of Eddie's Ribs.

6. Aguilera believed the written amount was about $1,500.

maining counts in his indictment under Rule 8(a) of the Federal Rules of Criminal Procedure. Rule 12(b) of the Federal Rules of Criminal Procedure requires that this challenge to the indictment must be brought prior to trial or it is deemed to be waived. Because Balzano failed to file a timely motion alleging misjoinder prior to trial, we thus review this challenge under the "plain error" standard. *See* Federal Rule of Criminal Procedure 52(b). In *United States v. White*, 903 F.2d 457, 466–67 (7th Cir.1990), we stated:

> "As we observed in *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir. 1984): 'To be plain, an error must be conspicuous, at least in hindsight....' As we have also noted:
>
> > "A plain error is an error that is 'not only palpably wrong but [is] also likely to cause the outcome of the trial to be mistaken.' *United States v. Kehm*, 799 F.2d 354, 363 (7th Cir.1986). 'A reversal on the basis of plain error can be justified "only when the reviewing court is convinced that it is necessary in order to avert an actual miscarriage of justice."' [*United States v. Requarth*, 847 F.2d 1249, 1254 (7th Cir. 1988)] (quoting *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir. 1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985))."
>
> *United States v. Dietrich*, 854 F.2d 1056, 1060 (7th Cir.1988)."

■ Federal Rule of Criminal Procedure 8(a), governing the joinder of offenses involving a single defendant,[7] provides, in relevant part, that "[t]wo or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged ... are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." It is likely that Balzano's involvement in the extortion and conspiracy crimes alleged in the remaining counts of his indictment was one of the subjects of Mofreh's grand jury testimony. It is also obvious that Balzano's gestures were intended to silence and throw fear into Mofreh before testifying about Balzano's participation in the conspiracy and extortion counts. Because Balzano's intimidation of Mofreh was an attempt to prevent testimony concerning Balzano's criminal activities, and "a conspiracy and its cover-up are parts of a common plan, there would be no possible problem of misjoinder if the government's argument had any factual basis...." *United States v. Velasquez*, 772 F.2d 1348, 1354 (7th Cir.1985) (Citation omitted). Thus, because the witness intimidation count was clearly part and parcel of the same criminal scheme, the joinder of the witness intimidation count with the other crimes charged complied with the requirements of Rule 8(a) and was neither error, nor "plain error."

## B. *Severance*

"As the Supreme Court has said, 'once the Rule 8 requirements [are] met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14....' *United States v. Lane*, 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986) (interpreting *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960))." *United States v. Garner*, 837 F.2d 1404, 1412 (7th Cir.1987), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988). Balzano filed a motion for severance alleging that the witness intimidation count should have been severed before trial under Rule 14. Balzano alleged that severance was necessary because evidence presented on the witness intimidation count might improperly affect the jury's consideration of the remaining counts. He also asserted that severance was required because it was his intention to testify only on the witness intimidation count and not to testify on any of the remaining counts. At his trial, Balzano did not testify in his own defense.

---

7. *See United States v. Diaz*, 876 F.2d 1344, 1355 (7th Cir.1989) (quoting 8 J. Moore, *Moore's Federal Practice* § 806[1] at 8–25 (2d ed.) ("Rule 8(a) may be applied *only* to offenses joined against a single defendant....") (Emphasis in original).

In *United States v. Moya–Gomez*, 860 F.2d 706, 754 (7th Cir.1988), we summarized the law applicable to the review of a district court's severance decision:

"Rule 14 permits the trial court, in the exercise of its discretion, to grant separate trials when the interests of justice so require. A district court's ruling on a Rule 14 severance motion will be overturned only upon a showing of abuse of discretion. Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defendant bears an extremely difficult burden of showing on appeal that the district court abused its discretion. In order to appeal successfully the denial of a severance motion, a defendant must establish actual prejudice resulting from the denial. Actual prejudice means that the defendant could not have a fair trial without severance, ' "not merely that a separate trial would offer him a better chance of acquittal." ' [*United States v. Peters*, 791 F.2d 1270, 1301 (7th Cir.), *cert. denied*, 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986)] (quoting *United States v. Papia*, 560 F.2d 827, 836 (7th Cir.1977))."

(Footnote and citations omitted).

■ Initially, we turn to Balzano's claim that the trial court's refusal to sever the trial on the witness intimidation count was prejudicial to him as the jury improperly considered evidence relevant to the witness intimidation claim in reaching its verdicts upon the other counts. Courts have held that evidence of a defendant's attempts at intimidation of a witness or of a person cooperating with a government investigation is admissible to demonstrate a defendant's "consciousness of guilt" of the charges which were the subject of the witness' testimony or cooperation. *See United States v. Mendez–Ortiz*, 810 F.2d 76, 79 (6th Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987) ("Evidence that defendant attempted to bribe and threaten a witness is admissible to show consciousness of guilt."); *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir.1986) (In a conspiracy case evidence of a threat against a potential witness "may be admitted to show consciousness of guilt"); *United States v. Hammond*, 781 F.2d 1536, 1540 (11th Cir.1986) (In a conspiracy case "[c]ourts may consider evidence of attempts to influence a witness as relevant in showing a consciousness of guilt."). *See also Weinstein's Evidence*, ¶ 401[10] at 401–72 to 74, n. 21 and cases cited therein. As noted in *United States v. Moya–Gomez*, 860 F.2d 706, 768 (7th Cir. 1988): " 'In those instances where evidence of one crime is admissible at a separate trial for another, it follows that a defendant will not suffer any additional prejudice if the two offenses are tried together.' " (Quoting *United States v. Foutz*, 540 F.2d 733, 736 (4th Cir.1976) (footnote omitted)). Thus, the court did not err in declining to sever the witness intimidation count from the extortion and RICO conspiracy counts, because the evidence relevant to the witness intimidation count could have been admitted at a trial on any of the remaining counts or a combination of the counts to demonstrate consciousness of guilt. *See also United States v. L'Allier*, 838 F.2d 234, 241 (7th Cir.1988) (Defendant not prejudiced when "[m]ost of the evidence relating to Count II would have been admissible in a separate trial on Count I."); *United States v. Garver*, 809 F.2d 1291, 1298 (7th Cir.1987) (Denial of motion for severance did not prejudice defendants where evidence would have been admissible in separate trials).

In *United States v. Moya–Gomez*, 860 F.2d at 768, we went on to observe:

"Furthermore, even if, in a separate trial, the evidence would not have been admitted, we still would hold that the district court's denial of a severance was not an abuse of discretion in this case. Although the trial was long, the evidence on count 18 was not complex. As Mr. Moya–Gomez admits, the government's proof on count 18 consisted chiefly of the testimony of Agent Felts. There was little or no possibility that the jury could have been confused over which evidence related to which count. This court has observed that ' "[t]he question of wheth-

er a joint trial infringes upon the defendant's right to a fair trial depends on whether it is within the jury's capacity, given the complexity of the case, to follow admonitory instructions and to keep separate, collate and appraise the evidence relevant only to each defendant."' United States v. Cavale, 688 F.2d 1098, 1107 (7th Cir.) (quoting United States v. Hedman, 630 F.2d 1184, 1200 (7th Cir. 1980), cert. denied, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981)), cert. denied, 459 U.S. 1018, 103 S.Ct. 380, 74 L.Ed.2d 513 (1982); see also [United States v.] Rajewski, 526 F.2d [149, 155 (7th Cir.1975), cert. denied, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976) ] ('If the jury can reasonably be expected to keep the evidence separate as to each count and each defendant, severance should be denied.'). Here, the jury was instructed to give separate consideration to each count in the indictment. 'This instruction was an adequate safeguard against the risk of prejudice in the form of jury confusion, evidentiary spillover and cumulation of evidence.' [United States v.] Berardi, 675 F.2d [894, 901 (7th Cir.1982) ]. 'Under our jury system ... it is fundamental that we reasonably trust juries to make factual determinations in accordance with the court's instructions.' [United States v.] Aleman, 609 F.2d [298, 310 (7th Cir.1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) ]."

Similarly, the jury in this case was instructed that: "Each count should be considered separately, and a separate verdict should be returned as to each count. Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to any other count." Furthermore, the witness intimidation count involved facts that occurred several years after the other counts, readily permitting the jury to "relate the evidence to the proper count." L'Allier, 838 F.2d at 241. Thus, as in Moya–Gomez, Balzano "has not met his heavy burden of demonstrating prejudice from the joinder of [the witness intimidation count with any of the remaining counts] so as to render the district court's denial of a severance an abuse of discretion." Moya–Gomez, 860 F.2d at 768.

There is another reason why the denial of severance would not result in actual prejudice, i.e., deprivation of a fair trial. As will be discussed in Section II, infra, the evidence of Balzano's guilt on the RICO conspiracy and extortion counts was very convincing. In an analogous situation we have held that alleged violations of the Confrontation Clause were harmless beyond a reasonable doubt in light of the overwhelming evidence of the defendant's guilt. See United States v. Mayomi, 873 F.2d 1049, 1057 (7th Cir.1989) ("In light of the overwhelming evidence against Mayomi regarding his involvement in the importation and possession of heroin, we hold that any error in limiting the defendant's cross-examination of Ashton with respect to either the identity of the informant or Ashton's previous involvement, if any, in FBI investigations, was harmless."); Smith v. Fairman, 862 F.2d 630, 639 (7th Cir.1988) ("In light of all of this evidence, we do not think that the admission of Mrs. Smith's testimony that Boyle once told her, in a drunken state, that he was not certain who he had seen on the night of the murder, would have affected the jury's verdict. Even absent the hearsay testimony regarding Boyle's identification of Mr. Smith, which Mrs. Smith's testimony was primarily designed to impeach, the evidence of Mr. Smith's guilt was overwhelming. The erroneous exclusion of that testimony was therefore harmless beyond a reasonable doubt."). Similarly, the overwhelming evidence of Balzano's guilt on the RICO conspiracy and extortion counts meant that there was no actual prejudice accompanying a joint trial of all of the counts because the jury clearly would have convicted Balzano even if it had not been permitted to hear or consider evidence regarding Balzano's witness intimidation.

Balzano has failed to cite any cases in support of his claim mandating the severance of trials of different offenses involving a single defendant where the cases are all part of the same and related

scenario of criminal activity because the defendant's desire to testify with respect to only one of the counts against him. However, in *United States v. Archer*, 843 F.2d 1019, 1022 (7th Cir.1988), we considered the case of a defendant desiring severance of counts against him based upon his desire to testify with respect to only one count, noting:

> "We have held that '[s]everance is not mandatory every time a defendant wishes to testify to one charge but to remain silent on another. If that were the law, a court would be divested of all control over the matter of severance and the choice would be entrusted to the defendant.' *United States v. Peters*, 791 F.2d 1270, 1287 (7th Cir.1986) (quoting *Holmes v. Gray*, 526 F.2d 622, 626 (7th Cir.1975), *cert. denied sub nom.*, *Holmes v. Israel*, 434 U.S. 907, 98 S.Ct. 308, 54 L.Ed.2d 194 (1977)). Nevertheless, we recognize that sometimes circumstances can coerce a defendant into testifying on a count upon which he wishes to remain silent. '[A] defendant may be willing to take the stand and testify as to one count but might prefer to remain silent and put the government to its proof on another count.' *United States v. Lewis*, 547 F.2d 1030, 1033 (8th Cir.1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977). In such cases, severance may be necessary. We agree with the District of Columbia Circuit, however, that this need for severance does not arise 'until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other.' *Baker v. United States*, 401 F.2d 958, 977 (D.C.Cir.), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); *see also Holmes v. Gray*, 526 F.2d at 626."

*Accord United States v. Ely*, 910 F.2d 455 (7th Cir.1990).

Balzano has neglected to set forth any specific examples of the alleged exculpatory testimony he would have presented in a separate trial on the witness intimidation count. This falls far short of satisfying the requirement of a "convincing" demonstration that Balzano had " 'important testimony to give concerning' " [8] the witness intimidation count necessary to support severance under Rule 14. Furthermore, we have held that a defendant fails to make a convincing demonstration of a "strong need to refrain from testifying" on particular counts when "[w]ithout [the defendant's] testimony, the government offered sufficient evidence to support the jury's verdict" on these counts. *Archer*, 843 F.2d at 1022. As will be fully set out in our discussion of the sufficiency of the evidence supporting Balzano's convictions for RICO conspiracy and witness intimidation, there was more than sufficient evidence to demonstrate beyond a reasonable doubt Balzano's guilt on each and every one of the counts of which he was convicted. Furthermore, in considering the related situation of severance of the trials of two or more defendants on the ground that a co-defendant would offer exculpatory testimony in a severed trial, we have held that:

> "When a defendant seeks a severance to avail himself of allegedly exculpatory testimony from a co-defendant, a trial court should consider three factors:
>
> '(1) Whether the co-defendant's testimony would be exculpatory; (2) Whether the co-defendant would in fact testify; and (3) Whether the testimony would bear on defendant's case.' "

*United States v. Studley*, 892 F.2d 518, 525 (7th Cir.1989) (quoting *United States v. Melton*, 689 F.2d 679, 686 (7th Cir.1982) (Citations omitted)). We went on to point out that:

> " 'The mere possibility of a co-defendant's testimony is insufficient grounds for a severance.' *United States v. Kord*, 836 F.2d 368, 373 (7th Cir.), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988). 'To justify severance, a defendant must provide some support, such as an affidavit or recorded testimony, that his co-defendant would testify in a man-

---

**8.** *Archer*, 843 F.2d at 1022 (quoting *Baker*, 401 F.2d at 977).

ner which would exculpate him. Severance cannot be granted on the basis of a vague, unsupported assertion that a co-defendant would testify favorably in a separate proceeding.' *United States v. Andrus*, 775 F.2d 825, 847 (7th Cir. 1985)."

*Studley*, 892 F.2d at 525. We believe that when exculpatory testimony forms the basis of requests for either severance of defendants or severance of offenses, a defendant is required to present more than "a vague, unsupported assertion" speculating about the possibility of exculpatory testimony which he might choose to offer in a separate trial. Furthermore, Balzano has failed to set forth any specific examples of the exculpatory evidence he would have presented in a separate trial on the witness intimidation count. As the court held in *Studley*, Balzano "has done nothing more than make a bald allegation of a mere possibility that [he] would give exculpatory evidence in a severed proceeding." *Studley*, 892 F.2d at 525. Such an allegation is insufficient to constitute the actual prejudice necessary to obtain severance under Federal Rule of Criminal Procedure 14.

## III.

### SUFFICIENCY OF THE EVIDENCE

Balzano challenges the sufficiency of the evidence supporting each of his five convictions. "In evaluating [Balzano's] sufficiency of the evidence challenge, we note that [he] bears a heavy burden. Initially, we 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.'" *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984)). "The test is whether after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Pritchard*, 745 F.2d at 1122 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

Juries frequently are required to rely upon circumstantial evidence in reaching their verdicts. In *United States v. Grier*, 866 F.2d 908, 923 (7th Cir.1989), a case involving circumstantial evidence of a conspiracy and a defendant's participation in a conspiracy, we observed:

> "'Of course, direct evidence of that agreement need not be shown, "an agreement can be inferred from the circumstances."' *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir. 1988) (quoting *United States v. Neapolitan*, 791 F.2d 489, 501 (7th Cir.1986)). 'Because conspiracies are carried out in secret, direct proof of agreement is rare.' *United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988) (citations omitted).
>
> "'Not only is the use of circumstantial evidence permissible, but "circumstantial evidence 'may be the sole support for a conviction.'"' *United States v. Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)). '"Circumstantial evidence is not less probative than direct evidence and, in some cases is even more reliable."' *Williams*, 798 F.2d at 1039 (dissenting opinion) (quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir.1974)). *See also Wisconsin Jury Instruction—Criminal, No. 170* ('[C]ircumstantial evidence may be stronger and more convincing that [sic] direct evidence'). '[T]he evidence "'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.'" *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v. Thornley*, 707 F.2d 622 (1st Cir.1983)).' [*United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988) ]."

We have gone on to observe recently that:

> "In reviewing the sufficiency of the evidence in cases where the government's proof has been largely circumstantial, we have said: '[W]hile it is important that we not permit a verdict based solely on the piling of inference

upon inference, it is also imperative that we not rend the fabric of evidence and examine each shred in isolation....' [*United States v. Moya–Gomez*, 860 F.2d 706, 759 (7th Cir.1988)] (quoting *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983) (citations omitted))."

*United States v. Johnson*, 903 F.2d 1084, 1087 (7th Cir.1990).

In weighing direct and circumstantial evidence, the trier of fact plays a particularly significant role as the arbiter of credibility:

"[W]e defer to the jury's determination of witnesses' credibility. As we noted in *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986): 'An appellate court will not weigh the evidence or assess the credibility of the witnesses.' Similarly, we have stated: ' "It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact." ' *United States v. Perry*, 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman*, 728 F.2d 846, 856 (7th Cir.1984)). Finally, 'the credibility of witnesses is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances.' *United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir.1985)."

*United States v. Vega*, 860 F.2d 779, 794 (7th Cir.1988).

### A. *The Extortion Convictions*

■ Balzano urges that the government presented insufficient evidence to convict him of each of three counts of extortion violative of the Hobbs Act, 18 U.S.C. § 1951. "The Hobbs Act defines extortion as 'the obtaining of property from another with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.' 18 U.S.C. § 1951(b)(2)." *United States v. Garner*, 837 F.2d 1404, 1421 (7th Cir.1987), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988).[9] We have explained how a public officer's abuse of his office can constitute extortion for purposes of 18 U.S.C. § 1951:

"In *United States v. Holzer*, 816 F.2d 304, 310 (7th Cir.1987), *vacated and remanded on other grounds*, 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1988), this court recognized that the two forms of extortion proscribed by § 1951 are equally applicable to the conduct of public officials who take unlawful advantages of 'opportunities' relating to their public office. In reaching this conclusion, we noted that the scope of the two statutory prohibitions should be distinguished.

A public official violates the first prong of § 1951(b)(2) when he or she either acts or wields the powers of office in such a way that it causes a victim to fear some form of retribution if payment of a demanded price is not forthcoming. *Id.* at 310. In short, '[e]xtortion by wrongful use of fear of economic harm is established by showing that the defendant preyed upon or exploited the victim's fear of economic harm.' *United States v. Nedza*, 880 F.2d 896, 902 (7th Cir.1989) (quoting *United States v. Lisinski*, 728 F.2d 887, 890 (7th Cir.), *cert. denied*, 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984)). It is obvious that the statute prohibits an official from exploiting a victim's fear through both threatening positive action that will harm the victim, or threatening to withhold official action that will result in some form of harm being visited upon the victim. *Holzer*, 816 F.2d at 310. Additionally, an official violates the 'color of official right' prong of § 1951(b)(2) when he or she encourages or accepts payments prompted by the hope that the official

9. In relevant part, 18 U.S.C. § 1951 provides: "(a) Whoever in any way or degree obstructs, delays or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, ... shall be fined not more than $10,000 or imprisoned not more than 20 years or both.

(b) As used in this section— ... (2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

will be influenced in the exercise of his or her powers. *United States v. Garner*, 837 F.2d 1404, 1423 (7th Cir.1987), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988); *Holzer*, 816 F.2d at 310."

*United States v. Davis*, 890 F.2d 1373, 1378 (7th Cir.1989). The question presented on review is whether there is any evidence which would allow a rational trier of fact to conclude that Balzano either (1) wrongfully induced payments through an actual or threatened fear of economic harm, or (2) encouraged payments when acting in his official capacity as a fire inspector "under the color of official right." *See Davis*, 890 F.2d at 1378.

### 1.

### The Club Victoria Extortion Count

█ In the Club Victoria liquor license application extortion case Jennifer Hammersmith, a co-owner of Club Victoria, testified that Balzano required that she hire a particular craftsman to perform construction work as well as demanding $2,500 for himself. In requiring this of Hammersmith, Balzano stated "he could make [her] do anything that he wanted to" and that before Hammersmith's property were to be approved for Code compliance she would have to come up with the money. Balzano received the $2,500 payoff and the contractor hired upon his recommendation performed the work and received the payment for his services.

These facts demonstrate that Balzano was "exploiting a victim's fear through both threatening positive action that will harm the victim" and through "threatening to withhold official action that will result in some form of harm being visited upon the victim." *Davis*, 890 F.2d at 1378. In stating that "he could make [Hammersmith] do anything that he wanted to" with respect

to the employment of his friend, and in demanding a payoff of $2,500 to gain approval of the task force inspection, Balzano both "threaten[ed] positive action harm[ful]" [10] to Hammersmith, "exploiting [her] fear," [11] and "threaten[ed] to withhold official action that [would] result in ... harm." [12] Moreover, Balzano's behavior constituted extortion under the "color of official right" as Balzano certainly "encourage[d] or accept[ed] payments prompted by the hope that [he would] be influenced in the exercise of [his] powers." *Davis*, 890 F.2d at 1378. A rational jury could very properly find the necessary elements of extortion based upon the totality of the evidence presented.

Aware that Jennifer's testimony was very damaging, Balzano contends that the jury's verdict must be reversed because Hammersmith was not a credible witness. [13] We again remind Balzano of the fact that " 'it is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact.' " *United States v. Perry*, 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman*, 728 F.2d 846, 856 (7th Cir.1984)). As we have further held: "[T]he credibility of witnesses is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances." *United States v. Noble*, 754 F.2d 1324, 1332 (7th Cir.1985). Indeed, "we will uphold the verdict unless the ... testimony is incredible as a matter of law." *United States v. Dunigan*, 884 F.2d 1010, 1013 (7th Cir. 1989). "To be incredible as a matter of law, a witness' testimony must be unbelievable on its face...." *Dunigan*, 884 F.2d at 1013 (citations omitted). As demonstrated previously, Hammersmith's account of Balzano's successful attempt to obtain work for his friend and a $2,500 payoff for

---

**10.** *Davis*, 890 F.2d at 1378.

**11.** *Id.*

**12.** *Id.*

**13.** In support of this position, Balzano argues that Hammersmith's testimony was inconsist-

ent, citing discrepancies between her trial testimony and earlier statements concerning individuals present at the time of the payoffs. Balzano also argues that Hammersmith has had a history of making wild accusations regarding the misconduct of public officials.

himself graphically portrayed the commission of the crime of extortion. We, like the jury, are of the opinion that her account of the payoff was credible in that it portrayed Balzano's behavior consistent with the same modus operandi (payoffs made to Balzano after Balzano had allegedly discovered fire code compliance problems) Balzano had utilized in other extortion incidents.

### 2.

### The United Skates Extortion Count

██ Balzano next contends that there was insufficient evidence to support his conviction for extortion stemming from his efforts to secure a VCR and television from United Skates of America when that business applied for a liquor license, as fully recounted in our previous discussion of the facts. There can be little doubt that the incident at United Skates constitutes extortion under either the "fear" prong or the "color of official right" prong of 18 U.S.C. § 1951(b)(2). Clearly the fire inspector (Balzano), while acting within the scope of his official duties, was "exploiting [Grisamore's] fear" [14] as he threatened to withhold fire inspection approval unless a costly sprinkling system was installed or he received a VCR. Furthermore, it is clear that the fire inspector's statement that there would be no problems with the inspection (sprinkler system) if the boys at the station house received the video cassette recorder constituted extortion under the "color of official right," because the inspector was encouraging "payments prompted by the [victim's] hope that [he would] be influenced in the exercise of [his] powers." [15]

Balzano again does not contest the point that the inspector who made the threat against United Skates committed extortion. Instead, Balzano's claim is that there was insufficient evidence for the jury to conclude that *he* was the inspector who committed the extortion. Balzano primarily relies upon Grisamore's failure to give a positive I.D. of him at the trial of the extortion attempt. The absence of direct eyewitness evidence of identification is not decisive because "[a] jury may properly rely upon circumstantial evidence in convicting a criminal defendant." *United States v. Khorrami,* 895 F.2d 1186, 1191 (7th Cir. 1990). Circumstantial evidence may also prove particularly useful in resolving questions of identification. *See United States v. Carrasco,* 887 F.2d 794, 810–811 (7th Cir.1989) (relying upon circumstantial evidence as a basis for holding that sufficient evidence supported a jury finding that a defendant joined a conspiracy).

Direct as well as circumstantial evidence provides strong support for the jury's conclusion that Balzano was, in fact, the fire inspector involved in the attempted extortion of United Skates, despite Grisamore's failure to provide positive I.D. testimony. Although Grisamore did not testify that the inspector identified himself as Daniel Balzano, he did testify that the inspector identified himself as one of the members of the team that inspected United Skates and that combined with the fact that Grisamore recognized the inspector as a member of the earlier inspection team and further that Fire Department official business records confirmed Balzano's participation in that particular inspection. Furthermore, Balzano's identification was corroborated with Grisamore's testimony at trial that served to furnish a description of the inspector matching Balzano. Additional support for the identification was given in Allenson's testimony at trial both that Grisamore confirmed in a telephone conversation on the very day of the extortion attempt that Balzano was the inspector who had visited him and that Balzano's name was inscribed on a piece of paper that Allenson received from Grisamore during a visit shortly after the extortion attempt.[16] Finally, support for the identification of Balzano as the inspector involved was provided when, during his confrontation with Terry Mofreh after the

---

14. *Davis,* 890 F.2d at 1378.

15. *Davis,* 890 F.2d at 1378.

16. During his meeting with Balzano, Grisamore requested that Balzano write his name and telephone number on a piece of paper, and Balzano complied.

extortion attempt, Balzano failed to deny the extortion, but dreamed up a feeble excuse for his unlawful shakedown when stating that United Skates had promised him a video recorder. This circumstantial evidence, combined with the other testimony, obviously convinced the jury that the fire inspector involved in the extortion at United Skates was, in fact, Daniel Balzano. Thus, from our review, we are convinced that there exists sufficient evidence in the record to support the jury's verdict that Balzano committed the crime of extortion in the United Skates shakedown.

### 3.

### The Eddie's Ribs Extortion Count

Balzano contends that the evidence was insufficient to support the extortion count involving the Eddie's Ribs food and liquor license applications, where, as recounted in the Facts section of the opinion, he allegedly received a payoff from the restaurant's owner in lieu of requiring extensive repairs. Again there is little doubt that this incident constitutes extortion under either the "fear" or the "color of official right" prongs of 18 U.S.C. § 1951(b)(2). As was the case with the United Skates shakedown, the fire inspector sought to obtain property from the proprietor of Eddie's Ribs by "threatening to withhold official action,"[17] (the rendering of a passing mark on the fire inspection) "that [would] result in some form of harm being visited upon the victim." *Davis*, 890 F.2d at 1378. Not only was the fire inspector's action an exploitation of Cesar Aguilera's "fear," it also violated the "color of official right" prong of section 1951(b)(2) as the fire inspector both encouraged and accepted "payments prompted by the [victim's] hope that [the fire inspector would] be influenced in the exercise of [his] powers." *Davis*, 890 F.2d at 1378. Thus, the conduct of the fire inspector in the course of the Eddie's Ribs license applications constituted extortion.

Balzano does not attack the jury's finding that the facts presented constitute extortion for purposes of 18 U.S.C. § 1951(b).

Rather, Balzano argues that the evidence was insufficient because Aguilera failed to properly identify him as the fire inspector involved and because the jury improperly found Aguilera's testimony credible despite Aguilera's failure to remember the exact amount of the payoff.

Although Aguilera did not directly identify Balzano as the individual who extorted money from him, as in the case of the United Skates extortion conviction, the jury, in combination with the other testimony, was presented with convincing circumstantial evidence supporting the identification of Balzano as the individual guilty of the crime of extortion. " 'Circumstantial evidence is not less probative than direct evidence and, in some cases is even more reliable.' " *Grier*, 866 F.2d at 923 (quoting *Williams*, 798 F.2d at 1042). The description of the fire inspector that Aguilera presented matched that of Balzano. Furthermore, the City's inspection task force records establish that Balzano was the fire inspector assigned to both the inspection and re-inspection of Eddie's Ribs. The defendant also used the same modus operandi of requesting a payoff in lieu of expensive repairs as he did in the United Skates extortion incident. This circumstantial evidence, when considered in conjunction with the direct evidence, provided the basis for a reasonable factfinder to conclude beyond a reasonable doubt that Balzano was, in fact, the fire inspector who extorted money from the proprietor of Eddie's Ribs.

Balzano goes on to argue that the jury should not have believed Cesar Aguilera's testimony because he failed to directly identify Balzano, gave no specific dates when the extortion allegedly occurred and was unable to specifically recount the exact sum of money he paid Balzano. As discussed earlier in the Club Victoria extortion count, the jury is the "arbiter of credibility"; and "[m]ere inconsistencies in the witness' testimony do not render it legally incredible." *Dunigan*, 884 F.2d at 1013. The fact that Aguilera could not make a positive I.D. of Balzano and could not re-

---

17. *Davis*, 890 F.2d at 1378.

member all of the minute details of the extortion incident falls short of leading us to the conclusion that the witness' testimony is incredible as a matter of law. The weight that will be given the particular witness' testimony is a jury question, and the jury has spoken. The jury obviously determined that the testimony coherently and plausibly sets forth a clear and unequivocal act of extortion in which Daniel Balzano victimized Aguilera.

## B. *The RICO Conspiracy Conviction*

Balzano goes on to argue that the evidence was insufficient to support his conviction for conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d).[18] We have recognized that "a conspiracy to violate RICO should not require anything beyond that required for a conspiracy to violate any other federal crime." *United States v. Neapolitan*, 791 F.2d 489, 497 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986). In *Neapolitan* we quoted the requirements for proof of participation in a RICO conspiracy (an agreement to participate in the affairs of an enterprise through a pattern of racketeering) found in the Fifth Circuit's decision in *United States v. Bright*, 630 F.2d 804, 834 (5th Cir.1980):

> " 'To be convicted of a conspiracy to violate RICO there must be proof that the individual, by his words or actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise, through the commission of two or more predicate crimes.' "

*Neapolitan*, 791 F.2d at 497 (quoting *Bright*, 630 F.2d at 834). Then, in *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir.1988), we considered the facts the government is required to prove a defendant's guilt of conspiracy to violate RICO:

> "To find a defendant guilty of conspiracy to violate RICO, the government must show that the defendant 'was aware of the essential nature and scope of the enterprise and intended to participate in it.' *United States v. Bruun*, 809 F.2d [397, 410 (7th Cir.1987)]. While there is no need to prove that the defendant intended personally to perform the two predicate acts required for RICO liability, *United States v. Neapolitan*, 791 F.2d 489, 498 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986), the government does have to show more than 'mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions....' *United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985); *see also United States v. Williams*, 798 F.2d 1024, 1028 (7th Cir.1986). The government has to show that there was an agreement between the members of the conspiracy. Of course, direct evidence of that agreement need not be shown, 'an agreement can be inferred from the circumstances.' *United States v. Neapolitan*, 791 F.2d at 501."

We have, however, recognized that there are "two aspects of the 1962(d) conspiracy that serve to limit the scope of the theory: (1) the nature of the agreement required and (2) the necessity of proving the existence of an enterprise." *Neapolitan*, 791 F.2d at 498.

 Initially we turn to the question of whether there existed an "enterprise" for purposes of RICO. "The term 'enterprise' is defined [in RICO] as including 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' § 1961(4). There is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of indi-

---

18. 18 U.S.C. § 1962(d) provides:
 "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."
 18 U.S.C. § 1962(c) provides:
 "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

viduals associated in fact. On its face, the definition appears to include both legitimate and illegitimate enterprises within its scope...." *United States v. Turkette*, 452 U.S. 576, 580–81, 101 S.Ct. 2524, 2527–28, 69 L.Ed.2d 246 (1981). "[T]he central element of an enterprise is structure." *Neapolitan*, 791 F.2d at 500. The Chicago Fire Department is a legitimate governmental entity possessing a clear organizational structure, thus qualifying as an "enterprise" under RICO.

We now turn to the question of whether there existed the required agreement to establish a conspiracy. In *Neapolitan*, we described the agreement that must be proven in a RICO conspiracy:

"From a conceptual standpoint a conspiracy to violate RICO can be analyzed as composed of two agreements (in reality they would be encompassed by the same manifestations of the defendant): an agreement to conduct or participate in the affairs of an enterprise and an agreement to the commission of at least two predicate acts. Thus, a defendant who did not agree to the commission of crimes *constituting a pattern of racketeering activity is not in violation* of section 1962(d), even though he is somehow affiliated with a RICO enterprise, and neither is the defendant who agrees to the commission of two criminal acts but does not consent to the involvement of an enterprise. If either aspect of the agreement is lacking then there is insufficient evidence that the defendant embraced the objective of the alleged conspiracy. Thus, mere association with the enterprise would not constitute an actionable 1962(d) violation. In a RICO conspiracy, as in all conspiracies, agreement is essential."

*Neapolitan*, 791 F.2d at 499 (citations and footnote omitted) (emphasis added).

Balzano does not challenge the fact that as an inspector for the Fire Prevention Bureau of the Chicago Fire Department, he agreed to participate in the affairs of the Department (the enterprise). Balzano contends that he did not agree to the commission of at least two predicate violations of state or federal law, as required to demonstrate a pattern of racketeering activity under RICO, and that any predicate acts that might have been committed were undertaken individually, and there was, thus, not the agreement necessary to establish a RICO conspiracy.

Our resolution of Balzano's insufficiency of the evidence challenge to his RICO conspiracy conviction does not require us to define in minute detail the type of conduct necessary to constitute an agreement to perform two or more predicate acts under RICO. The record reflects that Balzano and Fire Inspector Richard Dorband agreed to split the bribes Woo Kim (China Moon Restaurant) gave Dorband during the course of a task force inspection of that restaurant. Certainly knowingly sharing in the proceeds of a bribe constitutes agreement to the predicate act of violating the state bribery statute. Furthermore, Terry Mofreh's testimony concerning the manner in which he paid Dorband during the task force inspection of United Skates and the consultation that took place between Dorband and Balzano establishes that Dorband and Balzano collaborated in setting the amount of the bribe they would receive. The jury was entitled to believe Mofreh's testimony and conclude that Balzano and Dorband agreed to solicit and accept the bribe in violation of state bribery law.[19] Thus, sufficient evidence was presented to the jury for it to reasonably find that Balzano and Dorband, in their splitting of the bribe from the China Moon Restaurant and in Dorband's acceptance of a bribe from Terry Mofreh at United Skates of America, agreed to commit two

---

19. Balzano urges that the jury should have believed Dorband's testimony that Dorband and Balzano were each taking individual bribes. Initially, we wish to point out that when challenging the sufficiency of the evidence, the evidence is viewed in the light most favorable to the government. *United States v. Nesbitt*, 852

F.2d 1502, 1509 (7th Cir.1988). Furthermore, even if there was an arrangement between Balzano and Dorband to receive individual bribes from the same party, still there would be sufficient evidence of an agreement to commit the predicate act of violating the state bribery statute.

separate and distinct predicate acts, and we uphold Balzano's RICO conspiracy conviction.

### C. The Witness Intimidation Conviction

■ Balzano finally challenges the sufficiency of the evidence to support his conviction for threatening and intimidating a grand jury witness in violation of 18 U.S.C. § 1512(b).[20] In *United States v. Johnson*, 903 F.2d 1084, 1087 (7th Cir.1990), we held that "[t]o prove witness intimidation, the government must show (1) the defendant[ ] knowingly used intimidation, physical force, or threats against [an individual] (2) with the intent to influence and prevent [the witness] from testifying in an official proceeding and to cause [the witness] to withhold testimony in an official proceeding." "Section 1512(b) ... does not require that the witness in fact be intimidated into not testifying—the focus is on the endeavor to bring about the proscribed result, rather than on the success of the endeavor." *Johnson*, 903 F.2d 1088, n. 5.

The evidence in the record not only clearly, but convincingly, establishes that Balzano knowingly used tactics of intimidation against Mofreh. Mofreh's testimony, corroborated with the testimony of FBI Agent O'Malley and Assistant U.S. Attorney Raphaelson as to his fear, demonstrates that Balzano utilized hand gestures mimicking the slashing of a throat and the threat of a gun. Balzano desperately launches an attack on Mofreh's character and credibility, but we advise he and his attorney that it was for the jury to determine credibility. Obviously Balzano and his trial attorney failed to convince the jury, and Balzano and his appellate attorney now rehash the same tirade of accusations and innuendos before this court, and once again they fall on deaf ears. The jury's credibility determination appears particularly appropriate where, as here, Balzano's conduct toward Mofreh is corroborated in the testimony of a witness who spoke with Mofreh immediately after the incident.

The remaining question is whether Balzano's conduct was engaged in with the intent to influence and prevent Mofreh from testifying and to cause Mofreh to withhold testimony in an official proceeding. In a recent witness intimidation case, we noted that:

"Although it is difficult to find direct evidence in the record of the defendants' intent to intimidate and retaliate against [the witness], direct evidence of intent is usually unavailable. In general, it is necessary to prove intent through circumstantial evidence, and a jury may thus rely on evidence of this nature to find that a defendant had the requisite intent to commit the crime charged. Circumstantial evidence, moreover, is no less probative than direct evidence."

*Johnson*, 903 F.2d at 1087 (citations omitted). There is no shadow of a doubt that Balzano knew that Mofreh was cooperating with the government as a witness in the grand jury proceeding since Dorband, in a taped telephone call, had previously advised him that Mofreh was cooperating with the government in the investigation of corruption among City inspectors as his activity of threat or intimidation toward Mofreh is clear and convincing evidence of knowledge. Furthermore, based upon his past involvement in transactions involving Mofreh, Balzano was aware that Mofreh possessed information (particularly with respect to the incident at United Skates) that could result in testimony damaging to Balzano. In addition, Balzano was aware that Mofreh's testimony was imminent as Balzano observed Mofreh seated outside the grand jury room, and his threatening conduct confirms this knowledge. In light of these facts, the jury properly inferred that Balzano's intimidating acts were performed with the intent to prevent Mofreh from

---

**20.** 18 U.S.C. § 1512(b) provides, in relevant part:

"Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so ... with intent to—(1) influence, delay, or prevent the testimony of any person in an official proceeding; (2) cause or induce any person to—(A) withhold testimony ... shall be fined not more than $250,000 or imprisoned not more than 10 years, or both."

testifying in the grand jury proceeding and thus to influence Mofreh to withhold testimony from the grand jury. Sufficient evidence exists to support the jury's verdict that Balzano violated 18 U.S.C. § 1512(b).

## IV.

### INEFFECTIVE ASSISTANCE OF COUNSEL

 Balzano filed a *pro se* brief alleging that his conviction should be reversed because of the ineffectiveness of trial counsel. In *United States v. Moya–Gomez*, 860 F.2d 706, 763–64 (7th Cir.1988), we outlined the high mountain a defendant must climb to demonstrate ineffective assistance of counsel:

"The defendant bears a heavy burden in establishing an ineffective assistance of counsel claim. He must show (1) that his attorney's representation fell below an objective standard of reasonableness (performance prong), *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), and (2) that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different (prejudice prong), *id.* at 694, 104 S.Ct. at 2068. *See also United States ex rel. Barnard v. Lane,* 819 F.2d 798, 802 (7th Cir.1987); *United States v. Hillsberg,* 812 F.2d 328, 336 (7th Cir.), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). With regard to the performance prong, the defendant must identify the specific acts or omissions of counsel that formed the basis for his claim of ineffective assistance. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. The court 'must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' *Id.* The court's scrutiny of counsel's performance must be conducted with a high degree of deference and without the distorting effects of hindsight. *Id.* at 689, 104 S.Ct. at 2065; *United States v. Scherwood,* 770 F.2d 650, 655 (7th Cir. 1985). As to the prejudice prong of the

inquiry, a 'reasonable probability' of a different result means a 'probability sufficient to undermine confidence in the outcome [of the trial].' *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068."

Thus, ineffective assistance of counsel requires a showing that representation fell below an objective standard of reasonableness, and there exists a reasonable possibility that, but for unprofessional errors, the result of the proceedings would have been different. *See Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674 (1984); *United States v. Moya–Gomez,* 860 F.2d 706, 763 (7th Cir.1988).

 Initially, the defendant Balzano asserts that his trial counsel was ineffective because he was under investigation on criminal tax matters during the period immediately preceding Balzano's trial meaning that he "was not in a position to vigorously represent defendant at trial and thereby chance antagonizing the government [through] a rigorous defense of [d]efendant...." Supplemental Brief for Appellant at 1. In *United States v. Barnes,* 909 F.2d 1059, 1065 (7th Cir.1990), we observed that:

"It is well settled that '[a] criminal defendant is entitled to counsel whose undivided loyalties lie with the client.' *United States v. Ellison,* 798 F.2d 1102, 1106 (7th Cir.1986); *United States v. Noble,* 754 F.2d 1324, 1333 (7th Cir.1985); *United States ex rel. Williams v. Franzen,* 687 F.2d 944, 948 (7th Cir.1982). Thus, a criminal defendant may premise a claim of ineffective assistance of counsel on the fact that his attorney was burdened by a conflict of interest. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). 'Although the issue of conflict typically arises in a case involving joint representation, it may also arise when a client's interest conflicts with that of his attorney.' *Ellison,* 798 F.2d at 1106–07. The sixth amendment requires that trial courts, upon a defendant's timely objection that a conflict ex-

ists, hold a hearing to determine whether the potential conflict jeopardizes his right to counsel. *Holloway,* 435 U.S. at 486–87, 98 S.Ct. at 1179–80. However, when no objection is presented to the trial court, 'a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel.' *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718. Thus, in order to establish constitutionally ineffective assistance of counsel based upon an alleged conflict of interest, 'a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' *Id.* at 348, 100 S.Ct. at 1718."

Initially we discuss the question of whether a presumption of prejudice should arise from the alleged conflict of interest resulting from the trial counsel's ongoing criminal tax investigation. The trial court, after having been apprised of the alleged conflict of interest, held a hearing in May 1987, a month prior to trial, in which Balzano was advised that there had been "an IRS ... investigation of trial counsel, who is the attorney of record." During that hearing Balzano assured the court that he wished to continue with his present trial attorney. Balzano now seeks to circumvent his statement to the court with an assertion that his decision was not free and voluntary as a result of the close proximity of the trial and the fact that his lawyer allegedly would not refund his fee. However, Balzano failed to inform the trial court that his choice was motivated by any of these concerns and never requested the trial court to grant a continuance of the trial in order that he might retain a new attorney. Thus, based upon our perusal of the record, we are convinced that the trial court thoroughly explored the alleged conflict of interest based on the evidence presented, and it ill behooves Balzano to now fault the trial court for failing to ascertain his newly discovered alleged "hidden" motivations for his decision to continue to retain his trial counsel. Because Balzano failed to assert any of the reasons he now argues motivated his conduct, his failure certainly leaves a deep suspicion that these reasons were afterthoughts dreamed up for purposes of this appeal. Balzano was responsible for the trial court's lack of knowledge of the alleged details of Balzano's determination to continue to retain his trial counsel. Thus, Balzano is required to demonstrate that "an alleged conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348–49, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980).

When a criminal defendant asserts that an investigation of the criminal activities of his attorney creates a conflict between the attorney's interest in protecting himself from criminal investigation and the defendant's interest in effective representation, we have held that an "actual conflict of interest" exists only where there is a danger that the defense attorney would ineffectively represent his client because of fear that authorities might become aware of the attorney's own misconduct if he undertook effective representation. *See Cerro v. United States,* 872 F.2d 780, 785–86 (7th Cir.1989) (No actual conflict of interest where "[t]here was no danger that authorities would learn something novel about [the attorney's] possible involvement in criminal activities...."). Balzano's trial attorney's representation of Balzano on his extortion, RICO conspiracy and witness intimidation charges would not have affected his completely unrelated personal criminal tax investigation. Thus, we reject Balzano's contention that the facts demonstrated an actual conflict of interest resulting in ineffective assistance of counsel.

■■■ Balzano goes on to argue that his attorney's alleged 100–day fast resulted in a deterioration of his health to a degree that resulted in ineffective assistance of counsel. Balzano failed to bring this matter to the attention of the trial court, and there is nothing in the record other than the defendant's self-serving statement that would support Balzano's assertion about his attorney's lengthy fast or that it affected his counsel's ability.[21] However, Balza-

---

21. Balzano relies upon the fact that his attorney said that he had to go to the doctor at one point.

no urges that his trial counsel's alleged poor health resulting from his fast gave rise to several specific examples of behavior that fell outside an objective standard of reasonable performance and prejudiced Balzano.

The first of these is his trial attorney's failure to call all the witnesses that were named on the witness list submitted to the government during discovery proceedings. Specifically, Balzano alleges that his trial attorney failed to call specific witnesses to impeach testimony given by government witnesses. In *United States v. Adamo*, 882 F.2d 1218, 1227 (7th Cir.1989), a case rejecting an ineffective assistance of counsel claim based upon failure to call a witness, we observed:

> "This court has frequently considered whether and under what circumstances counsel's failure to call ... witnesses to testify amounts to ineffective assistance of counsel. *See, e.g., United States v. Olson*, 846 F.2d 1103 (7th Cir.1988); *Sullivan v. Fairman*, 819 F.2d 1382 (7th Cir.1987). These decisions recognize that once defense counsel conducts a reasonable investigation into all lines of possible defenses, counsel's strategic choice to pursue one line to the exclusion of others is rarely second-guessed on appeal. An appellate court will review an ineffective assistance of counsel ground only if counsel's conduct or decision was not made 'in the exercise of reasonably professional judgment.' *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. *See also United States ex rel. Robinson v. Pate*, 312 F.2d 161, 162 (7th Cir.1963) (counsel not ineffective because strategic choice was one about which competent attorneys might honestly disagree). The appellate court will make ' "every effort ... to eliminate the distorting effects of hindsight" ... and must apply a "heavy measure of deference to counsel's judgment." ' *Sullivan*, 819 F.2d at 1391 (quoting *Strickland* [466 U.S.] at 689, 691, 104 S.Ct. at 2065, 2066)."

Balzano alleges that his trial counsel should have called witnesses whom Balzano felt could have impeached government witnesses on matters collateral to the litigation. We remind Balzano that when an attorney in the course of a trial makes "[s]trategic choices ... after thorough investigation [they] are virtually unchallengeable." *Sullivan*, 819 F.2d at 1391 (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2065–66). "[T]rial counsel [need not] track down every lead or ... personally investigate every evidentiary possibility before choosing a defense and developing it." *Id.* at 1392. The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record. In *United States v. Olson*, 846 F.2d 1103, 1110 (7th Cir.1988), we rejected a similar ineffective assistance of counsel claim based upon a trial attorney's failure to call a witness for the purpose of impeaching another witness, observing:

> "At the June 23 evidentiary hearing, Mr. Coffey testified that he did not call Cornelius to testify at trial because Cornelius had a felony record, and his affidavit referred to the fact that defendant Olson and Wanda Dick had been in custody on state charges of kidnapping. In Attorney Coffey's professional judgment, revealing the fact of Olson's incarceration on those charges by calling Cornelius to testify would not have been in Olson's best interest. Moreover, Mr. Coffey did call another witness, Judith Long, who testified that Wanda Dick had told her that if Olson went back to his wife, she would ruin his life. Ms. Long did not have a felony record, and her testimony regarding her conversation with Dick did not involve revealing the fact of the defendant's prior incarceration on kidnapping charges. We can only conclude that Mr. Coffey's handling of this matter was a proper exercise of good trial judgment.

Even if we agree that he did fast, this is hardly a sufficient basis to establish an impairment from the decrease in his food and substance intake.

In addition, since the Cornelius testimony would have been cumulative if presented and, in our opinion, damaging to the defendant's case, we conclude that the decision to refrain from calling him as a witness was proper and in no way prejudiced the defense." [22]

Similarly, in light of the trial judge's strong reservations concerning the permissibility of impeachment evidence on collateral matters under Fed.R.Evid. 608, we believe that Balzano's trial attorney's strategic choice to refrain from calling witnesses who would testify solely as to collateral matters was an appropriate "exercise of reasonable professional judgement." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

■■■ Balzano goes on to catalog a number of other alleged errors of his trial counsel that allegedly constituted ineffective assistance. In *Adamo*, we noted:

"As the Supreme Court observed in *Strickland*, it is not our purpose in evaluating an ineffective assistance claim to grade counsels' performance. 466 U.S. at 697, 104 S.Ct. at 2069. Thus, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' *Id.*"

*Adamo*, 882 F.2d at 1228. Upon our review of the transcript, we have ascertained nothing that would demonstrate that Balzano's attorney failed to exercise "reasonable professional judgment" with respect to the alleged errors set forth below. Nonetheless, we apply the approach followed in *Adamo* and consider only whether any of the remaining ineffective assistance of counsel claims prejudiced Balzano. The Supreme Court has given the following description of the required prejudice inquiry:

"[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors."

*Strickland*, 466 U.S. at 695–96, 104 S.Ct. at 2068–69.

We now examine whether Balzano suffered any "prejudice" from any of the remaining alleged errors. We turn initially to Balzano's attorney's failure to complete impeachment of government witnesses Roy LaBolle and Terry Mofreh with evidence of prior convictions. Because LaBolle was unable to provide significant damaging evidence against Balzano, the alleged failure to impeach his credibility clearly had little impact on the outcome of Balzano's trial. Mofreh's character was thoroughly attacked during the cross-examination conducted by Balzano's trial attorney, and any additional impeachment of one other conviction, in our opinion, would have had only a minor effect on the jury's consideration of Mofreh's credibility. Thus, the failure to provide one more conviction as an additional impeachment of Mofreh had no effect on the outcome of Balzano's trial. *See United States v. Olson*, 846 F.2d at 1110. (Defendant failed to establish prejudice in a case where he admitted that " 'trial counsel [did make] inroads during cross-examination in discrediting the three ... main witnesses.' ").

Balzano next states that his attorney failed to object to leading questions the government posed to witness Tom Grisa-

---

22. The Attorney Coffey involved in *United States v. Olson* is not related to the author of this opinion.

more. However, this failure had negligible prejudicial impact, if any, upon Balzano's case, as in our opinion the questions involved minor issues regarding the facts surrounding particular license applications. In addition, the trial court commended Balzano's attorney's approach to this matter, noting that it may have been the best one at that juncture of the proceedings. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable...." *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066. As we held in another case involving an alleged improper failure to raise an objection: "This is a matter of trial tactics on the part of experienced trial counsel which this court will not second-guess, particularly in light of the improbability that counsel's decision affected the verdict, given the overwhelming evidence of Olson's guilt." *Olson*, 846 F.2d at 1111. Thus, not only was there an absence of prejudice, but the trial court's recognition of the wisdom of Balzano's attorney's tactics demonstrates that he exercised "reasonable professional judgment." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

Balzano further asserts that he was prejudiced when his trial attorney failed to object to testimony regarding Hammersmith's payments by check to the craftsman Balzano recommended to Hammersmith. Balzano believes that this testimony did not concern him and, thus, was irrelevant. There was no basis for an objection to the admission of testimony concerning these payments because they were clearly relevant in establishing the context of Balzano's extortion of Jennifer Hammersmith, which included the direction of Hammersmith's repair work to the individual Balzano recommended. In addition, Balzano's attorney on cross-examination was able to establish that Balzano did not receive the proceeds from these checks. Thus, Balzano not only failed to suffer any prejudice, but in light of the fact that his attorney would have been unable to have had this testimony excluded even if he had made an objection, his attorney properly exercised well-reasoned professional judgment in his trial strategy in an attempt not to highlight by detailed questioning but rather to limit the damage Balzano suffered from the introduction of this evidence.

Finally, Balzano failed to demonstrate prejudice resulting from his trial attorney's alleged improper failure to thoroughly investigate his case through listening to both the inculpatory and exculpatory tapes received from the government during discovery. "[I]n order to establish prejudice resulting from a failure to investigate, the defendant must make ' "a comprehensive showing of what the investigation would have produced." ' *Sullivan* [*v. Fairman*, 819 F.2d 1382, 1392 (7th Cir.1987)] (quoting *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir.1987))." *Olson*, 846 F.2d at 1109. In his opening brief Balzano was unable to specifically demonstrate any exculpatory evidence on the involved tapes.[23] Balzano fails to enumerate specific inculpatory evidence on the tapes and the fact that only two tapes were played at trial would lead one to the reasonable conclusion that there was little inculpatory evidence on these tapes. We noted a similar problem in *United States v. Olson*, 846 F.2d at 1111, where we held there was no prejudice from trial counsel's failure to investigate a witness when the defendant "fail[ed] ... to allege specifically what evidence such investigation and interviews would have uncovered; and, aside from a conclusory allegation that the defense was impeded in attempting to impeach the government's three main witnesses, he fail[ed] to recite any facts that might even remotely result in prejudice." In light of Balzano's failure to make " 'a comprehensive showing of what the investigation would have produced,' " [24] we are of

---

**23.** Although Balzano purported to provide examples of such evidence in his reply brief, it is well settled that a matter may not be raised for the first time in a reply brief. *See Sims v. City of Madison*, 902 F.2d 524, 536 n. 5 (7th Cir. 1990).

**24.** *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir.1987) (quoting *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir.1987)).

the opinion that the defendant has failed to demonstrate prejudice. *See Olson,* 846 F.2d at 1109–10 (holding that prejudice was not established where "[t]he defendant and his appellate counsel fail[ed] ... to specify what witnesses an investigation would have uncovered or what their testimony would have added to [the] defense."). *See also Olson,* 846 F.2d at 1110 ("We note that Attorney Coffey vigorously cross-examined the three women at trial. We refuse to find that his decision not to interview or investigate them, based on his professional judgment and thorough knowledge of the case, was deficient performance. The defendant has clearly not established any prejudice stemming from the allegedly deficient performance; indeed, aside from his unsupported, conclusory statement, he has alleged none.").

The overwhelming evidence offered against Balzano further supports a conclusion that Balzano did not suffer prejudice from the performance of his trial attorney. As thoroughly detailed in our discussion of the sufficiency of the evidence in section III, *supra,* the government's evidence clearly established Balzano's guilt beyond a reasonable doubt to each and every one of the crimes for which he was charged. Indeed, as we noted in the sufficiency of evidence discussions, Balzano generally offered only poorly reasoned credibility and identification-based challenges to the sufficiency of the evidence for each of the involved crimes. In light of the overwhelming evidence of guilt presented during the trial, we are of the opinion that Balzano has failed to demonstrate that "the decision reached would reasonably likely have been different absent [his attorney's] errors." *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069. We reject his ineffective assistance of counsel claim.

Balzano's ineffective assistance of counsel claims, that he brought *pro se,* are patently frivolous. As we admonished in *United States v. Olson,* 846 F.2d at 1111:

"Many of these claims of ineffective assistance of counsel which come to our attention, like the claims raised here, are without merit and accomplish little other than the waste of judicial resources, and

possibly reflect unfairly on trial counsel. While the Supreme Court has noted that it is a 'natural tendency to fault an unsuccessful defense,' it has stated forcefully that the tendency is one that courts must 'counteract.' *Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 994, 89 L.Ed.2d 123 (1986). Otherwise,

'[c]riminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one on counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.' *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Thus the Court, in *Strickland,* set a stringent standard to be applied to claims of ineffective assistance of trial counsel and it should be adhered to."

Not only were the ineffective assistance of counsel claims totally lacking in merit, but Balzano's entire appeal, which commenced with his filing of a *pro se* notice of appeal, was frivolous. We commend Balzano's appointed counsel who called the court's attention to this problem at the outset of the litigation, sought to withdraw and filed an *Anders* brief detailing the appeal's lack of merit. After Balzano filed a response we gave him the benefit of the doubt and ordered the appeal to proceed. But, upon a full consideration of the issues, we are convinced that Balzano's appeal was frivolous. As we noted in *United States v. Adamo,* 882 F.2d at 1235, Balzano has

"raise[d] a number of grounds for reversal in this case, none of which are persuasive. This is the sort of 'buckshot approach,' where [defendant] has only a mere 'hop[e] [that] a pellet will strike,' that this court has disapproved in the past, *Ruiz v. Cady,* 710 F.2d 1214, 1218 (7th Cir.1983), and again disapproves today."

*Adamo,* 882 F.2d at 1235. In an era of burgeoning federal court case loads, it is a

senseless drain on judicial resources for us to be required to devote the time necessary to a complete consideration of issues on appeal which are entirely lacking in substance. This waste of judicial time is especially ironic because Balzano was sentenced to only six months of prison with work release privileges on convictions which carried a maximum total sentence of 90 years in prison and $305,000 in fines. We are utterly surprised since a defendant who receives nothing but a mere slap on the wrist after having been convicted of most serious criminal activity should consider himself most fortunate and is in no position whatsoever to complain of the treatment he has received in federal district court. If there ever was a valid argument for the Sentencing Commission because of disparity of sentences, this is it. Bribery of public officials in most cities of the United States is considered a *serious* crime.

The jury's verdict against Balzano was based upon proof beyond a reasonable doubt as to each and every count contained therein and from our review of the record we are convinced that the trial court did not commit reversible error. Balzano's convictions are

AFFIRMED.