**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert J. REISWITZ, Sr. a/k/a Ronald
Beauchamp, a/k/a Meatball,
Defendant–Appellant.**

No. 88–1306.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 28, 1991.

Decided Aug. 15, 1991.

See also 941 F.2d 480.

Mel S. Johnson, Patricia J. Gorence, Elsa Lamelas, Matthew L. Jacobs, and Steven M. Biskupic, argued, Asst. U.S. Attys., Office of the U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Mary E. Gentile, argued, Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, and CUDAHY and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

A popular school composition theme is, "How I Spent My Summer Vacation." If he cared to, Robert John "Meatball" Reiswitz could have written a lengthy essay describing his activities during the summer of 1987. He and his pals robbed a few dozen Wisconsin convenience stores, gas stations, a tavern, and held up five banks at least seven times. This saga began when Reiswitz ran into his old prisonmate John Charles Fox. Between May 10 and July 4, 1987, Reiswitz and Fox engaged in a crime wave in the Milwaukee area. Reiswitz's role was to identify the businesses to be robbed, take care of the guns used in the robberies, and drive the getaway car.

Having warmed up on small businesses, Reiswitz and Fox switched over to robbing banks. Reiswitz selected Reliance Savings and Loan for a hit on July 3. He and Fox drove around the building, then Fox entered and robbed it. Reiswitz drove the getaway car. A week later, on July 10, Reiswitz dropped off Fox in an alley next to Reliance Savings. Fox robbed the bank yet again and left by the rear door, where he was met by Reiswitz in the getaway car. Reiswitz and Fox next took on the Marshall and Ilsley ("M & I") Bank. This time, Reiswitz's role was to distract anyone tailing Fox. This task prove unnecessary, and Reiswitz and Fox split the proceeds. Perhaps emboldened by their success thus far, Reiswitz developed a strategy for a second M & I caper. Fox was to enter the bank with a .22. Upon leaving with the loot, he was to get in his car and pursue an elusive route to the interstate. Reiswitz was to follow and signal to Fox if the coast was clear. If it was, Reiswitz was to take the lead. This particular plan went off without a hitch.

These crimes serve as a prologue for the events that led to this appeal. In early July 1987, Reiswitz and Fox met up with Martha Rose Coffman, who lived just across the border in New Albany, Indiana. (Reiswitz and Fox lived in Louisville, Kentucky.) She was a 43–year–old widow with an eighth grade education who earned $275 a month working twelve hour shifts in a nursing home. Six nights a week, she was a cocktail waitress at a bar called Wendall's. To boot, she supported a 22–year–old retarded son, Mick Lugar. Reiswitz and Fox strolled into Wendall's on Coffman's first day on the job. After learning that Coffman was tired of being broke, Reiswitz asked her if she would like to make some "big money" by robbing banks. About three weeks later, Coffman agreed. Shortly thereafter, Reiswitz, Coffman, Mick, and Gary Reed, who lived with Coffman, drove Reed's blue Pinto station wagon to Milwaukee. Reiswitz and Coffman left Mick and Reed in a park and headed straight for a bank. They were afraid to do anything, however, because there was a marked police car in the rear parking lot. They subsequently tried to rob a liquor store, but the doors automatically locked and Reiswitz had to kick his way out. Even though they could not accomplish what they came for, Reiswitz used the opportunity to offer Coffman instruction in the art of pulling a proper getaway.

Their robbery attempts foiled, Reiswitz and Coffman needed money to get home, so they picked up Reed and Mick and drove to a parking lot. Reiswitz instructed Reed and Mick to remove the Pinto's Indiana license plates and exchange them with Wisconsin plates stolen from a vehicle in the lot. Reiswitz then made Reed and Mick lie down on the floor of the car, and he and Coffman proceeded to a Cub Foods combination gas station and grocery store. Reiswitz told Coffman to move up the car when she saw him leaving the service station and to leave a door open for a quick getaway. Reiswitz entered, and, at gunpoint, threw a bag at the 17-year-old high school student who worked there part-time. He ordered her to put money in the bag, which she did. After the hold-up, Reiswitz jumped in the car and Coffman drove away. Coffman's reliability as a gun moll firmly established, the gang left Wisconsin.

A couple of days later, Reiswitz held "class" in his room at the Alamo Plaza Court Motel in Louisville. He instructed Coffman and Fox how to enter a bank, where to stand, and how to exit. Reiswitz warned Coffman to keep her mouth shut so

that her southern accent would not give her away. He told Fox and Coffman what to do if a teller did not fork over the money fast enough. They were to put a gun to the teller's head and fire in the opposite direction to scare the other tellers into thinking that their coworker had been shot.

Taking the state slogan, "Escape to Wisconsin" perhaps too seriously, on July 27, the newly educated Fox and Coffman drove to Milwaukee in a blue and white Cougar equipped with a CB. The car had another optional feature as well: two guns under the front seat. During the ride north, they were always in sight of Reiswitz, who drove a CB-equipped motorcycle. The three stopped at the Russell Road exit of I–94, where Reiswitz took Fox and Coffman through a robbery plan step-by-step. Reiswitz was to stay in front of the getaway car after the robbery if no one was following the gang. If there was a tail, Reiswitz would remain behind and blink his lights as a signal. He then would guide them through their escape plan over the CB radio. Afterward, everyone was to reassemble at the Russell Road truck stop.

Reiswitz led Fox and Coffman to the North Shore Savings and Loan Association and showed them how to park. According to plan, Reiswitz remained outside while Fox and Coffman robbed the bank at gunpoint. Afterwards, Reiswitz, Coffman, and Fox met at the Russell Road truck stop, where Reiswitz offered a critique of Fox and Coffman's "performance." They divided up the booty, drank coffee, and ate before returning to Indiana and Kentucky.

A short time later, the group gathered in Reiswitz's motel room to rehearse the next robbery. Fox had panicked during the last foray, so Reiswitz warned him to get "the crap out of his head and keep his mind on what he was doing." Trial Transcript ("Trial Tr.") at 119. Reiswitz warned the others to watch out for "dye bands" used by banks to identify stolen cash. He informed Coffman that he would get her a gun that worked in lieu of the one she had used for the North Shore job, which was rigged not to fire. On July 30, Fox, Coffman, and Reiswitz returned to Milwaukee

to rob the Republic Savings and Loan. The trio again assembled at the Russell Road truck stop to settle last-minute details. Clear on what they were supposed to do, Fox and Coffman entered the bank. This time, Coffman had a gun that worked— a .22 that Reiswitz had given her. As the robbers made their way out of the bank, Reiswitz instructed them over the CB that he had lost a white car that had been following them. He told them to go directly to the Russell Road truck stop, and that "he'd take care of the rest." Trial Tr. at 127. As before, Reiswitz, Fox, and Coffman divided the money before going back home.

Soon afterward, Coffman learned that Reed had confided to a friend about the Cub Foods service station robbery. Coffman told Reiswitz, and he instructed her to bring Reed to the Alamo Motel. There, Reiswitz put gun in Reed's mouth and cocked the hammer back. Reed confessed that he had done some talking, so Reiswitz and Coffman drove him out into the country and gave him the choice of either being shot or driving the getaway car at future robberies. With very little room to maneuver, Reed opted for the latter. The very next day, August 6, Coffman, Fox, and Reed drove to Wisconsin in Reed's Pinto, which was now equipped with a CB. Again, Reiswitz followed along on his motorcycle. Back at their usual Russell Road haunt, Reiswitz drew a map of the layout of Republic Savings. The map depicted nearby streets, tellers' windows, and an escape route. Reiswitz also drew in the relative positions of the Milwaukee Police and Sheriff's Departments. Reiswitz told Reed where to park, and gave him instructions on how to leave the bank. He reminded Coffman that, if the tellers did not move fast enough, she was to put the gun up to their heads, let it go off, and act like she hit them. This bit of advice proved disastrous for Coffman. During the robbery, she tried to act on Reiswitz's instructions, but instead shot herself in the arm. Reiswitz advised her not to seek medical attention to avoid detection by law enforcement authorities, but she disobeyed. The FBI traced her to a hospital within two

days of the robbery. When Reiswitz learned from Reed what had happened, he demanded that Reed get him the guns that were in the Coffman–Reed apartment.

The crime spree finally ended in a shootout at the North Shore Savings and Loan. On the evening of August 10, Fox and Reed drove to Wisconsin in Reed's Pinto. Reiswitz followed in a separate automobile. Reiswitz told Reed to drive to North Shore Savings, let Fox out, and pull up even with the doors until Fox came out. Fox held up the bank, but while doing so, he was observed by Milwaukee police officer Jerald Terek. The officer ordered Fox to stop. Fox pointed his gun at Terek, prompting the officer to open fire along with other police officers at the scene. The officers arrested Fox and Reed, who were both injured in the melee. When the police busted Reiswitz in front of his girlfriend's house on August 20, he was driving the CB-equipped motorcycle and was armed with a loaded gun that had been used in the bank robberies.

After his arrest and release from a hospital, Fox gave a statement to the Milwaukee police and to the FBI implicating Reiswitz in the bank and other robberies. Reiswitz was questioned by the FBI and voluntarily admitted that he drew the map used in the Republic Savings job and that he knew about the other robberies. Reiswitz also acknowledged that he might have encouraged Fox to rob Republic Savings. Reiswitz was charged with conspiracy in violation of 18 U.S.C. § 371, four counts of aiding and abetting armed bank robberies in violation of 18 U.S.C. § 2113(a) and (d), and four counts of aiding and abetting the commission of a crime of violence by the use of carrying of firearms in violation of 18 U.S.C. § 924(c). On October 20, 1988, a federal grand jury charged Fox, Reiswitz, Reed, and Coffman with the North Shore and the two Republic Savings robberies in a 16–count superseding indictment. Fox pleaded guilty in exchange for pleading to only three of the sixteen counts with which he was charged. He received a forty-five year sentence. On February 28, 1991, this court heard oral argument of Fox and Reiswitz's separate appeals. We affirmed Fox's conviction and sentence in an opinion issued this day. *See United States v. Fox,* 941 F.2d 480 (7th Cir.1991). Coffman and Reed also copped pleas and received prison sentences. As part of their deals, Fox, Coffman, and Reed testified as government witnesses at Reiswitz's trial.

Reiswitz was convicted of conspiracy, aiding and abetting armed bank robberies, and aiding and abetting the commission of a crime of violence with a firearm. On February 8, 1988, the district court sentenced him to a total term of sixty-five years in prison. The court also ordered him to make restitution in the amount of $8,923.37. In this appeal, he raises several challenges to his conviction. We take each one in turn.

■ Reiswitz's initial contention is that his case was seriously prejudiced by the fact that the government included the Cub Foods robbery in the indictment as an overt act made in furtherance of the federal conspiracy to commit armed bank robbery. Count One of the superseding indictment charged Reiswitz with a violation of 18 U.S.C. § 371, which provides, "If two or more persons conspire to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both." Paragraphs six through forty-one of Count One describe the overt acts that Reiswitz, Fox, Reed, and Coffman performed in furtherance of the conspiracy and to execute its objects. Reiswitz protests the inclusion in the indictment of the following three paragraphs:

8. On or about July 25, 1987, Reiswitz entered and robbed Cub Foods Service Station, 123 West Oklahoma Avenue, Milwaukee, Wisconsin, in order to get money to leave Wisconsin.

9. On or about July 25, 1987, Reiswitz paid some of the money that he stole from the Cub Foods Service Station robbery to Reed for driving Reiswitz and Coffman to Milwaukee.

10. Shortly after robbing Cub Foods Service Station, Reiswitz, Coffman, Reed and Lugar left Wisconsin.

 At trial, Reiswitz failed to object to the indictment or to the introduction of evidence regarding the robbery of the service station. The matter thus was not properly preserved on appeal under Federal Rule of Criminal Procedure 30. Nevertheless, Reiswitz's belated argument can still be reviewed under the strict standard of the plain error doctrine of Rule 52(a) of the Federal Rules of Criminal Procedure. *See United States v. Silverstein,* 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). In this type of review, we determine whether the alleged error resulted in a miscarriage of justice of such magnitude that the defendant probably would have been acquitted absent the error. *United States v. Smith,* 869 F.2d 348, 356 (7th Cir.1989). *See also United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); *Silverstein,* 732 F.2d at 1349. Before getting to each of Reiswitz's specific allegations, we first note that, in light of the overwhelming evidence of Reiswitz's role as planner, instigator, and weapons supplier, it is extremely unlikely that he would have been acquitted, even if the three state offenses were not included in the indictment.

That said, we turn to Reiswitz's argument. According to him, he should have been tried only for the federal crimes charged in the federal indictment. The pleading and proof of the state offenses as overt acts made in furtherance of a federal conspiracy prejudiced his right to a fair trial by confusing and misleading the jury. The inclusion of paragraphs eight through ten, Reiswitz's argument continues, required him to "prepare for a trial within a trial." Appellant's Brief at 10. Reiswitz completely misunderstands the law of conspiracy. Section 371 states that the overt act may be *"any* offense" committed in furtherance of the conspiracy. (Emphasis provided.) Conduct that constitutes an overt act can even be noncriminal, as long as it is done in furtherance of the goal of the agreement and manifests its existence. *See Yates v. United States,* 354 U.S. 298, 334, 77 S.Ct. 1064, 1084, 1 L.Ed.2d 1356 (1957). Reiswitz has cited no cases, and we have found none, holding that an overt act cannot be a state crime. Indeed, in *United States v. Murzyn,* 631 F.2d 525, 534–35 (7th Cir.1980), *cert. denied,* 450 U.S. 923, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981), we held that intrastate auto thefts in violation of state law properly were alleged as overt acts because the acts were taken to "effect the object of the conspiracy": the interstate transportation and sale of stolen motor vehicles, which is a federal crime. *See also United States v. Goldfarb,* 643 F.2d 422, 430 (6th Cir.) (under count for conspiracy to violate the federal Travel Act, violation of state gambling commission regulation "certainly" would be considered an overt act), *cert. denied,* 454 U.S. 827, 102 S.Ct. 117, 70 L.Ed.2d 101 (1981).

The paragraphs in question describe the purpose of the Cub Foods service station robbery: to get money for Reiswitz, Coffman, Fox, Reed, and Mick to keep themselves afloat after they abandoned their efforts to rob a bank and liquor store. It is important to keep in mind that, at this stage of the group's short history, Coffman was just a fledgling crook. Not only did Reiswitz use the robbery to get enough money to return to Kentucky, but also to "audition" Coffman for her role in future jobs. In that the acts described in the challenged paragraphs enabled Reiswitz to leave Wisconsin to plot subsequent bank robberies and to enlarge his "gang," they were undertaken in furtherance of the conspiracy.

 Besides, evidence of the service station robbery as an overt act was admissible under Federal Rule of Evidence 403, which provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Reiswitz did not threaten Reed until he had learned from Coffman that Reed had been blabbing about the service station robbery. Reiswitz's discovery that Reed had talked and

Reiswitz's subsequent threats precipitated Reed's decision to participate in the last two robberies. Therefore, even if not treated as an act in furtherance of the conspiracy, the Cub Foods heist was an integral part of the substantive offenses.

Reiswitz's second challenge also misses the mark entirely. The aiding and abetting statute under which Reiswitz was charged punishes as principals those who aid and abet a crime. Reiswitz insists that this crime requires proof of specific intent and that it was plain error for the trial court not to charge the jury accordingly. The jury was instructed as follows:

> Any person who knowingly aids, abets, counsels, commands, induces, or procures the commission of a crime is guilty of that crime. However, that person must knowingly associate himself with the criminal venture, participate in it, and try to make it succeed.
>
> Whatever a person is legally capable of doing he can do through another person by causing that person to perform the act. If the acts of another are willfully ordered, directed or authorized by the defendant, he is responsible for such acts as though he personally committed them.

This instruction was taken from our pattern instructions sections 5.08 and 5.07. See Federal Criminal Jury Instructions of the Seventh Circuit (1980). Reiswitz agues that, instead of the instruction given, the court should have informed the jury that it must "find that the defendant knew that the principal was armed and intended to use the weapon, and that the defendant intended to aid the principal in that respect." Appellant's Brief at 21–22.

At trial, Reiswitz failed to object to the aiding and abetting instruction, so again, our review is limited to plain error. Jury instructions must be reviewed in their entirety as a whole. We will not interfere as long as the instructions treated the issues fairly and adequately. See United States v. Ruiz, 932 F.2d 1174, 1179 (7th Cir.1991); United States v. McNeese, 901 F.2d 585, 607 (7th Cir.1990). In United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938), Judge Learned Hand stated the clas-sic formulation of the crime: association with the unlawful venture, knowing participation in it, and active contribution toward its success. Proof of specific intent is not a requirement. In McNeese, we noted that this "enunciation has been adopted by all federal appellate courts as the law of aiding and abetting...." 901 F.2d at 608. Our court, too, has adopted the Learned Hand definition of aiding and abetting and included it in our pattern instruction. See Ruiz, 932 F.2d at 1180. The court's proffered instruction thus fully and fairly incorporated every element of the crime.

Furthermore, the state of mind required for conviction as an aider and abettor is the same state of mind required for the principal offense. United States v. Valencia, 907 F.2d 671, 680–81 (7th Cir. 1990); United States v. Moya–Gomez, 860 F.2d 706, 756 (7th Cir.1988), cert. denied, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). Armed bank robbery is a general intent crime, see United States v. Fazzini, 871 F.2d 635, 641 (7th Cir.1989), cert. denied, —— U.S. ——, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989); therefore, the instructions adequately advised the jury of the mental element that the government was required to prove and the criteria by which the jury was to evaluate the evidence. In addition, Reiswitz's proposed instruction might have sunk rather than helped him. The committee comments to section 6.02 of the Federal Criminal Jury Instructions of the Seventh Circuit state that spelling out the difference between specific and general intent crimes does more to confuse than guide jurors. See Ruiz, 932 F.2d at 1182 ("We have recommended to the district courts that they avoid instructions that drag the jury through the 'specific intent'/'general intent' quagmire, because such instructions 'more likely confuse rather than enlighten juries.'") (citation omitted).

We similarly reject Reiswitz's other challenges to the jury instructions as a basis of reversing his conviction. The court's failure to include a specific intent instruction on the conspiracy count was not plainly erroneous. The instruction given

was a proper and accurate statement of conspiracy law. As with aiding and abetting, it is enough if a conspirator has the same mental state as the underlying crime requires. *See United States v. Feola,* 420 U.S. 671, 692, 95 S.Ct. 1255, 1267, 43 L.Ed.2d 541 (1975). It also was not plainly erroneous for the court to give a "circumstances of identification" instruction, which admonishes the jury to consider carefully the credibility of identification witnesses in light of the influences and circumstances under which eyewitness identification of the accused was made. Contrary to Reiswitz's assertions, identification was an issue at trial. After all, Fox, Coffman, and Reed knew Reiswitz as "Ron Beauchamp" and "Meatball." He was registered at the Alamo Motel under an assumed name. Dawn Bonar, the Cub Foods service station attendant, was challenged on cross-examination on the issue of identification.

■ Reiswitz also is out of luck on his challenge to the sufficiency of the evidence used to convict him of aiding and abetting armed bank robberies. Our job on appeal is to determine whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1978) (emphasis in original). We repeatedly have stated that defendants who attack the sufficiency of the evidence face an uphill battle. *See, e.g. Ruiz,* 932 F.2d at 1178; *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986) ("An appellate court will not weigh the evidence or assess the credibility of the witnesses."). Here, we must say, the hill is rather steep. The evidence adduced at trial showed that Reiswitz not only planned and directed the robberies, but actually conducted a "School for Scoundrels" in his room at the Alamo Motel in Louisville. He accompanied the robbers on jobs as a "blocker" and gave them feedback on how they conducted themselves during the heists. He drew a map, planned escape routes and rendezvous points, and recruited new personnel (in Reed's case, by sticking a gun down his throat). What's more,

he furnished some of the firearms, directed that they be used, and taught Coffman how to handle the .22 she carried to rob the Republic Savings and Loan. From this ample evidence, any trier of fact would have concluded that Reiswitz aided and abetted armed bank robberies.

■ Reiswitz has a final go at it by raising the inevitable ineffective assistance of counsel claim. This appeal marks the first time this issue has been raised. In direct appeals of criminal convictions, ineffective assistance of counsel claims are best dealt with at the district court level, either through a motion for a new trial, *see* Fed.R.Crim.P. 33, or through the collateral relief available under 28 U.S.C. § 2255. *See United States v. Lang,* 644 F.2d 1232, 1240 (7th Cir.), *cert. denied,* 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981). It is not our province as an appellate court to make findings regarding counsel's performance when, unlike the district court, we have not had the benefit of actually having observed it. However, we have the discretion to resolve an attorney incompetence issue when, as here, both parties ask us to resolve the matter, the question has been briefed and argued, and we have the entire trial record before us. *United States v. Williams,* 934 F.2d 847, 851 (7th Cir.1991); *United States v. Asubonteng,* 895 F.2d 424, 428 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990).

There is a strong presumption that counsel rendered reasonably effective assistance. *See Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) (because of the difficulty of evaluating trial decisions, court should be highly deferential when reviewing charges of deficient performance); *United States ex rel. Partee v. Lane,* 926 F.2d 694, 700 (7th Cir.1991). Consequently, Reiswitz bears a heavy burden in establishing an ineffective assistance claim. *See Moya–Gomez,* 860 F.2d at 763. In reviewing a claim of ineffective assistance of counsel, we look to the totality of circumstances. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065; *United States v. Hope,* 906

F.2d 254, 264 (7th Cir.1990), *cert. denied,* ——— U.S. ———, 111 S.Ct. 1640, 113 L.Ed.2d 735 (1991). To overcome that presumption and prevail on his claim, Reiswitz must show that his trial counsel's performance fell below an objective standard of reasonableness, and that counsel's deficiencies prejudiced his defense. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Moya–Gomez,* 860 F.2d at 763. The first component is satisfied if Reiswitz can identify specific "acts or omissions ... which were outside the range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. To satisfy the second component, Reiswitz "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. at 2068.

■ Reiswitz is unable to satisfy either *Strickland* prong. He presents a catalogue of complaints in which he claims that he was denied his constitutional right to effective assistance of counsel both before and during trial. He first charges that his attorney failed to file pretrial motions relating to the Cub Foods service station robbery. We assume that this objection is an extension of Reiswitz's argument that the government erroneously included state crimes in the indictment as overt acts made in furtherance of a federal conspiracy. Having failed to find any legitimate basis for excluding this information from the indictment, we find that defense counsel's failure to take pretrial action to object to the inclusion of this material was not indicative of deficient performance. Likewise, defense counsel acted reasonably in not filing a motion to suppress Dawn Bonar's identification of Reiswitz as the man who robbed her at gunpoint during the Cub Foods service station robbery. There was no legitimate basis to exclude this information. Reiswitz cannot point to even a hint of irregularity in the police line-up procedure. All he can complain about is that Bonar neither could pick out his photo from a series of mug shots nor identify him by sight from a police line-up. She did identify him from the line-up by voice, and successfully pointed him out at trial. Any discrepancy there might have affected the weight of the evidence, not its admissibility, and defense counsel had cross-examination at its disposal to expose any weaknesses in Bonar's identification. Without colorable grounds for challenging the Cub Foods evidence, counsel's decision to forego motions to suppress was eminently reasonable.

■ Also lacking merit is Reiswitz's argument that defense counsel should have moved to suppress the statement Reiswitz made to an FBI special agent. Following his arrest and waiver of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Reiswitz admitted to the agent that he had traveled to Wisconsin with Fox, Coffman, and Reed, and that he knew they had guns and were involved in robbing banks. Two weeks later, the agent prepared a written statement containing this admission and presented it to Reiswitz for signature. Reiswitz protested that he would not sign the statement unless his attorney saw it. The agent failed to follow up on this request, but Reiswitz signed the statement anyway. We fail to see how this situation constituted a violation of Reiswitz's fifth or sixth amendment rights. This is not a case where the government surreptitiously elicits an incriminating statement from the defendant in the absence of retained counsel. *See e.g., Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Here, Reiswitz was read his rights and chose to waive them. He then made incriminating statements regarding his involvement in the bank robberies. His signed statement merely confirmed what he already had told the authorities. If a defendant spontaneously volunteers information, either before or after being given *Miranda* warnings, those statements need not be suppressed. *See Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985); *United States v. Edwards,* 885 F.2d 377, 387 (7th Cir.1989). Defense counsel's failure to file a pretrial motion to suppress Reiswitz's statement did not prejudice his case one bit.

We next turn to Reiswitz's attack on his attorney's failure to challenge the admissibility of Fox, Coffman, and Reed's statements implicating Reiswitz in the conspiracy to rob banks. The rules regarding coconspirator statements relate to utterances that otherwise would be banned by the hearsay rule. Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a statement by a coconspirator of a party made during the course of and in furtherance of the conspiracy is not hearsay. It is a condition for the admission of coconspirator statements, however, that the government prove by a preponderance of competent evidence that it is more likely than not that a conspiracy existed, that the defendant and the declarant were members of the conspiracy, and that the statements were made during the course of and in furtherance of the conspiracy. *See United States v. Cox*, 923 F.2d 519, 526 (7th Cir.1991); *United States v. Santiago*, 582 F.2d 1128, 1130–31 (7th Cir. 1978). The most egregious error in his case, according to Reiswitz, was his defense counsel's failure to ask the trial court to determine if these three conditions were fulfilled before admitting his codefendants' statements.

Besides the fact that he fails to identify any statement that was admissible only under Rule 801(d)(2)(E), Reiswitz ignores the existence of *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). We have observed that, after *Bourjaily*, "the admissibility of coconspirators' declaration is not contingent on demonstrating by nonhearsay evidence either the conspiracy or a given defendant's participation." *United States v. Martinez de Ortiz*, 907 F.2d 629, 634 (7th Cir.1990). Moreover, the admissibility of a coconspirator's statements is solely a matter for the trial judge. *Id.* ("The judge admits the statements; the jury considers them. A judge won't let statements in unless he is satisfied that the accused joined the conspiracy.") Fox, Coffman, and Reed's in-court testimony established the existence of the conspiracy. The trial judge was convinced of Reiswitz's substantial role in the conspiracy before letting it in. There was, therefore, no need for a preliminary admissibility hearing. Even if there had been evidence admissible only under Rule 801(d)(2)(E), failure to object to it was harmless. Reiswitz's overt acts, including his intimidation of Reed to act as a getaway driver and his drawing a map of the layout of Republic Savings to assist Fox and Coffman rob the institution, establish by a preponderance of the evidence that a conspiracy existed and that Reiswitz participated in it.

Finally, Reiswitz presents a bevy of grievances regarding defense counsel's trial performance. He states that his attorney made few objections at trial and failed to follow through on an alibi defense. In addition, defense counsel failed to object when the court barred him from referring in closing argument to the testimony of Fox's cellmate that Fox, not Reiswitz, masterminded the bank robberies and threatened Gary Reed. Although a review of lawyers' tactical decisions in hindsight is not a fruitful exercise, *see Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Dyer*, 784 F.2d 812, 817 (7th Cir. 1986), we pored over the record for particular acts or omissions that prejudiced Reiswitz's case. Our examination came up short. Because Reiswitz has not demonstrated that trial counsel's failure to make objections or file certain pre-trial motions was a product of unreasonable strategic decisionmaking, this claim, too, fails.

Having concluded that the indictment and jury instructions were proper, that there was sufficient evidence to convict, and that counsel was constitutionally effective, we AFFIRM the conviction of Robert J. Reiswitz, Sr.