UNITED STATES of America,
Plaintiff–Appellee,

v.

Calvin BOOKER and James Blake,
Defendants–Appellants.

Nos. 91–3650, 91–3660.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1992.

Decided Dec. 8, 1992.

3. There is no need to address their discussions of the merits.

Larry Wszalek, (argued), Office of the U.S. Atty., Madison, WI, for plaintiff-appellee.

Robert E. Fisher (argued), Chicago, IL, for defendant-appellant Calvin Booker.

Shelia M. Hanely, Carl P. Clavelli, E. Steven Yonover, Chicago, IL, for defendant-appellant James Blake.

Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

To reach the allegations of ineffective assistance of counsel raised by the defendants, it is necessary to set forth the following facts. On the morning of May 20, 1991, a Wisconsin State Patrolman clocked a speeding maroon Cadillac at 80 miles per hour. Initially, Trooper Richard Blood observed only one occupant in the vehicle, a male driver. However, while Blood was signaling the vehicle to stop, a male passenger appeared and continually looked back at Trooper Blood. Made uneasy by the passenger's stares, Trooper Blood called in the stop to dispatch and asked for a license plate check on the vehicle.

The Cadillac pulled over to the side of the road and stopped, and the driver immediately stepped out of the vehicle. The officer directed the driver to return to his car and pull over farther onto the shoulder. The driver complied but again got out of the car and was instructed to return to his vehicle. Trooper Blood then approached the car, informed the driver of his speed violation, and requested a driver's license. The driver produced an Illinois license identifying him as Calvin Booker. The officer next asked for the vehicle's registration. Defendant Booker immediately indicated that he was merely the driver and that the passenger was responsible for the vehicle. However, the passenger answered that he did not have a registration for the car, which he had borrowed from his aunt. Further, the passenger was unable to produce personal identification. Trooper Blood questioned the men about their travel plans. Defendant Booker related that they were returning to Chicago after attending a funeral in Minnesota for one of the passenger's relatives.

In response to his radio call, Trooper Blood was advised that Mr. Booker's license was valid and that he had a criminal

history involving a weapons charge. The license plate check revealed that the Cadillac belonged to Margaret Richardson, a Chicago resident. Upon learning this information, the officer called for a back-up unit to assist him. He returned to the Cadillac and asked defendant Booker to step out of the car and speak with him. Mr. Booker told Trooper Blood that he had agreed to drive the passenger to Minneapolis for a funeral since the passenger did not have a driver's license. Mr. Booker claimed to have known the passenger for four or five years, but only knew him by his street name of "Red." Mr. Booker was not sure whether they had stayed with Red's friends or relatives while in Minneapolis.

During this discussion, Trooper Wagner arrived and took Mr. Booker back to his squad car while Blood went to talk with "Red." Initially, the passenger identified himself as James Richardson, stated that he had borrowed the car from his aunt to go to a friend's funeral, and that he and Mr. Booker had stayed with friends in Minneapolis.[1] During the conversation, Trooper Blood noticed that the car keys were attached to a ring with a white cardboard tag and were without a personalized key chain. Concerned by the passenger's inability to show any identification connecting him with the car, Trooper Blood asked the passenger if he would mind if Blood searched the vehicle. Defendant Blake answered "No, not at all. We're not that kind of people." Defendant Blake then offered to open the trunk and did so by opening the glove compartment and pushing the release button.

Defendant Blake got out of the car and stood behind it while Trooper Blood searched first the trunk and then the passenger side of the car's interior. As Blood moved from the right to the left side of the vehicle, defendant Blake called to him and cautioned him to be careful of the car's hood which was broken and might fall on his head. While investigating the driver's side of the car, Trooper Blood inspected the sunroof compartment and discovered a Taurus nine millimeter semi-automatic handgun, a Smith & Wesson nine millimeter semi-automatic handgun, and approximately an ounce of cocaine. Both guns were loaded with hollow point bullets, had their safeties off and were in positions easily reached by the car's passengers.

Following the discovery of the weapons and cocaine, both defendants were arrested and immediately searched. The search of defendant Booker revealed $703 in currency, and a search of defendant Blake revealed $6,270—$5,500 of it in his shoe. Detective Hefty, a Sauk County Sheriff's detective, arrived at the site to collect the evidence and interview the defendants. During his interview, Mr. Booker told Detective Hefty that the two men had stayed in a fancy hotel in Minneapolis. Eventually, both defendants were transferred to the Rock County Jail where they remained until their trial.

Prior to trial, the defendants unsuccessfully sought to exclude the evidence seized during the search of the Cadillac. Counsel[2] for each defendant challenged the reasonableness of the detention following the stop, the voluntariness of the consent for the search and the scope of the search. The magistrate judge found that the evidence was admissible because it was the result of a constitutionally proper consent search. The district judge adopted the magistrate's findings.

At trial, the government's theory of the case was essentially that the defendants were regular drug dealers who were completing a drug run from Minneapolis when they were stopped by Trooper Blood. The government supported its theory with testimony and physical evidence discussed below.

Mr. Booker and Mr. Blake countered that they were unaware that the car contained drugs and guns. Defendants supported their claim by pointing to the following facts: the car was not theirs, there were no

---

1. Later, the defendant gave the name James Blakely and finally was correctly identified as James Blake.

2. In the trial court, Mr. Booker was represented by attorney David G. Stokes, and Mr. Blake was represented by attorney Carl P. Clavelli.

fingerprints on the guns or cocaine baggie, they had been cooperative and consented to the search, and the large amounts of cash they had were gambling proceeds.

Following a two-day jury trial, both defendants were convicted of possession of cocaine with intent to distribute pursuant to 21 U.S.C. § 841(a)(1) and possession of a firearm in relation to a drug trafficking offense pursuant to 18 U.S.C. § 924(c)(1).[3] The district court denied both defendants' motions for new trials and this timely appeal followed.

On appeal, each defendant argues that he was denied effective assistance of counsel which prejudiced the results of his trial. Each defendant claims that his counsel's failure to question a witness' identification of Mr. Blake constituted ineffective assistance of counsel. Defendant Booker also objects to his counsel's overall performance, citing many specific failings.

■ Ineffective assistance of counsel claims are best brought before the district court through a motion for a new trial, FED.R.CRIM.P. 33, or via collateral relief under 28 U.S.C. § 2255. *United States v. Reiswitz*, 941 F.2d 488, 495 (7th Cir.1991), *cert. denied, Fox v. United States*, — U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992). However, we have granted review on direct appeal if the record is sufficiently developed with regard to the issue. *United States v. Williams*, 934 F.2d 847, 851 (7th Cir.1991); *United States v. Asubonteng*, 895 F.2d 424, 428 (7th Cir.), *cert. denied, Rivers v. United States*, 494 U.S. 1089, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). Because the record in this case is sufficiently developed, we turn our attention to the defendants' ineffective assistance of counsel claims.

■ To prevail on his ineffective assistance of counsel claim, each defendant must meet the two-pronged test identified in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must prove that his

counsel's performance was below an objective standard of reasonableness. *Id.* at 690, 104 S.Ct. at 2066. In particular, "the defendant must identify the specific acts or omissions of counsel that formed the basis for his claim of ineffective assistance." *United States v. Moya–Gomez*, 860 F.2d 706, 763–64 (7th Cir.1988), *cert. denied, Estevez v. United States*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). Second, the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

■ Defendants' counsel are presumed effective. *United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir.1990). Accordingly, defendants have a heavy burden to prove that their respective counsel were ineffective and their defenses were actually prejudiced. *Id.* As the examination of each of the defendants' complaints demonstrates, the defendants are unable to bear their burden.

### I.

■ Both defendants strenuously argue that their attorneys provided ineffective assistance by failing to challenge Amy Jackson's identification of Mr. Blake. Ms. Jackson, an Embassy Suites Hotel clerk, testified that she checked in a "Mike Tate" on the weekend of May 18, 1991, and that he had paid cash for his room. Ms. Jackson identified defendant Blake as Mike Tate, but did not identify Mr. Booker. Ms. Jackson further testified that she had "probably" seen defendant Blake again in the hotel a few weeks later, noting that the sightings were "relatively close together." The record clearly demonstrates that Ms. Jackson could not have seen Mr. Blake a few weeks later because he had been in custody since his arrest. However, the government corroborated Ms. Jackson's ini-

---

**3.** Defendant Blake was also convicted of possession of a firearm after being convicted of a  felony pursuant to 18 U.S.C. § 922(g)(1).

tial identification with Detective Hefty's testimony. Detective Hefty testified that defendant Booker told him that he and Mr. Blake had stayed in a "fancy hotel" in Minneapolis.

■ The record reveals that neither defense attorney questioned Ms. Jackson regarding her identification of defendant Blake. Defendants claim that their respective attorneys' failure to discredit Ms. Jackson's identification resulted in ineffective assistance of counsel. As mentioned, there is a strong presumption that counsel's performance was reasonable and competent. *Balzano*, 916 F.2d at 1294. In other words, if a reasonable tactical justification exists for counsel's actions, we will not find counsel's performance deficient. *Reiswitz*, 941 F.2d at 497. Although in general, defense counsel might attack the validity of an identification like Ms. Jackson's, we cannot say that the decision not to attack was wholly unreasonable in this case. Each counsel could have had valid tactical reasons for letting Ms. Jackson's testimony stand. For example, the jury's belief that the two men stayed in the hotel would be consistent with defense counsel's gambling theory of the case. Both counsel suggested in their closing arguments that the hotel stay was related to gambling.[4] Because a tactical reason can explain counsel's failure to attack Ms. Jackson's identification, we cannot say that counsel's performances were below an objective standard of reasonableness.

But even if we could conclude that defense counsel's performances were professionally lacking, the defendants cannot meet the prejudice prong of the *Strickland* test. The defendants would have us believe that if Ms. Jackson's identification had been successfully impeached, the jury would have questioned Detective Hefty's testimony and from there questioned the entire theory of the government's case. The record does not support such speculation, especially when Mr. Booker's counsel conceded that Mr. Booker had stayed in the hotel. Moreover, the defendants were caught "red-handed" in a car containing an ounce of cocaine and two loaded handguns. Their only defense was that they were unaware that the vehicle contained the contraband.

The government introduced overwhelming evidence that allowed the jury to conclude that the defendants had knowledge of the drugs and weapons, the least of which was Ms. Jackson's identification. The government's case did not rise or fall on Ms. Jackson's testimony or even on whether the defendants stayed in a hotel. There was credible evidence that the defendants had told inconsistent stories from the time of their initial speed stop. Both defendants had large sums of cash, one in his shoe, but neither had much evidence of the gambling activities that allegedly produced the money.[5] On the other hand, a government witness, Roy Hall, testified that while they were in jail together Mr. Booker told him that the defendants had been to Minneapolis and had obtained drugs from a drug dealer. Moreover, the accessible position of the guns in the car suggests that the passengers were aware of their presence. Because there was overwhelming evidence that the defendants knew the car contained drugs and guns without Ms. Jackson's testimony, there is no reasonable probability that the outcome of the trial would have been different had the defendants' attorneys challenged Ms. Jackson's identification. *Cf. United States v. Myers*, 892 F.2d 642 (7th Cir.1990) (because other evidence did not establish defendant's guilt beyond a reasonable doubt, case remanded to determine if attorney was ineffective by failing

---

**4.** Booker's counsel stated,

They [the government] had Amy Jackson who came in here and said that these folks stayed in a hotel. Mr. Booker, after a certain amount of not saying to the state trooper exactly what was happening, indicated that they did stay in a fancy hotel, and I want to explain that in a way I think was clear from the evidence. Mr. Booker ... gambles.

Similarly, Blake's counsel discussed Ms. Jackson's identification at the hotel and concluded, "Does that—what's that got to do with guns and the cocaine? Can it easily also have something to do with gambling?"

**5.** The only evidence connecting the defendants with gambling was some dice and an incomplete deck of cards found in the Cadillac.

to object to an eye witness' dubious identification). *But see United States v. Myers*, 917 F.2d 1008 (7th Cir.1990) (later proceeding's conclusion that attorney performance was adequate upheld on appeal).

## II.

Defendant Booker alleges that several errors by his counsel, Mr. Stokes, resulted in an overall performance so deficient as to render his assistance ineffective. We examine defendant Booker's claims individually and as a whole.

■ First, Mr. Booker argues that Mr. Stokes did not know or research the law applicable to consent searches prior to Mr. Booker's suppression hearing. Mr. Booker claims that Mr. Stokes' suppression memorandum failed to cite relevant legal precedent and failed to apply material facts to the precedent cited. A review of Mr. Stokes' brief reveals an adequate discussion of the legality of the defendant's detention at the roadside and of whether the trooper exceeded the scope of the consent search. The court agrees with Mr. Booker that Mr. Stokes' discussion of relevant law regarding consent searches is seriously deficient. However, because we conclude that the defendant was not prejudiced by counsel's alleged failure to discuss the law governing consent searches, we need not decide if Mr. Stokes' memorandum fell below an objective standard of reasonableness.

[I]t is not our purpose in evaluating an ineffective assistance claim to grade counsels' performance. 466 U.S. at 697, 104 S.Ct. at 2069. Thus, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. *Id.*

*United States v. Adamo*, 882 F.2d 1218, 1228 (7th Cir.1989).

■ Even if Mr. Stokes had provided a brilliant analysis of consent search law, the evidence still would not have been suppressed because Mr. Booker's consent was irrelevant. Under the Fourth Amendment, consent to a search may be obtained by any person who has common authority over the property. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *United States v. Garcia*, 897 F.2d 1413, 1419 (7th Cir.1990) (extending rule to automobiles). Moreover, a police officer need only receive consent from one person with authority over the vehicle, not all its occupants. *Id.* at 1419. During his initial contact with Trooper Blood, defendant Booker disclaimed ownership of the car and maintained that Mr. Blake had authority over the car. Thus, the only relevant consent issue at the suppression hearing was whether Mr. Blake's consent was valid, not whether Mr. Booker had consented. It is possible that Mr. Stokes realized that Mr. Booker's consent argument was weak and chose to concentrate on more viable arguments in his suppression brief. Since Mr. Booker has not shown that actual prejudice resulted from Mr. Stokes' suppression brief, this claim must fail.

■ Second, Mr. Booker claims prejudice resulted because Mr. Stokes was ignorant of the proper procedure for questioning witnesses and, thus, unable to impeach government witness Roy Hall. At trial, Roy Hall, Mr. Booker's fellow inmate at Rock County Jail, testified against Mr. Booker. Mr. Hall stated that Mr. Booker told him that he and Mr. Blake had taken a drug dealer's drugs and money in Minneapolis. On cross-examination, Mr. Stokes brought out the fact that Mr. Hall had a long criminal history and was a regular FBI informant. Under examination by Mr. Stokes, Mr. Hall also admitted that the U.S. attorney's office had promised to help him achieve parole and that he had received $100 in commissary money for his testimony. Defendant Booker argues that this was not effective impeachment of Mr. Hall. Mr. Booker claims that he was prejudiced because Mr. Stokes failed to elicit certain testimony from three other inmate witnesses which would have completely impeached Mr. Hall. We do not agree with Mr. Booker's analysis of the record.

It appears that only two other avenues of impeachment were available. One relat-

ed to Mr. Hall's reputation for truthfulness pursuant to Fed.R.Evid. 608(a) and the other related to whether Mr. Hall had ever talked to Mr. Booker about Mr. Booker's offense. Fed.R.Evid. 806. Mr. Stokes never adequately formulated his questioning of the three inmate witnesses to explore either of these two avenues of impeachment. However, Mr. Stokes was able to elicit *some* discrediting testimony from the three inmates. Apparently, Mr. Hall had told each of the inmates different versions of why he was in prison. Mr. Stokes was able to bring these inconsistencies to the jury's attention in attacking Mr. Hall's credibility. During direct examination, the three inmates also testified that one could easily read other inmates' "papers," giving support to the defense theory that Mr. Hall had seen Mr. Booker's papers describing his arrest and fabricated his testimony regarding Mr. Booker's remarks.

Mr. Booker's complaint is similar to that of the defendant in *United States v. Balzano*, 916 F.2d 1273 (7th Cir.1990). In *Balzano*, we held that the defendant was not prejudiced by counsel's failure to completely impeach a government witness, Mofreh, with evidence of prior convictions. *Id.* at 1295.

> Mofreh's character was thoroughly attacked during the cross-examination conducted by Balzano's trial attorney, and any additional impeachment of one other conviction, in our opinion, would have only a minor effect on the jury's consideration of Mofreh's credibility. Thus, the failure to provide one more conviction as an additional impeachment of Mofreh had no effect on the outcome of Balzano's trial.

*Id.* Likewise, in the instant case, Mr. Stokes adequately attacked Mr. Hall's credibility during cross-examination, and Mr. Stokes' inability to elicit certain testimony from the three inmates as additional impeachment had no effect on the outcome of Mr. Booker's trial.

█ Third, Mr. Booker argues that Mr. Stokes purposelessly introduced damaging evidence thus demonstrating his ineffectiveness as Mr. Booker's counsel. Specifi-

cally, Mr. Booker complains of two instances where Mr. Stokes brought out evidence that could have otherwise been excluded. During direct examination, Trooper Blood merely testified that Mr. Booker had a "criminal history." During cross-examination, Mr. Stokes brought out the fact that the "criminal history" consisted of a 1970's weapons charge.

As a reviewing court, our job is not to second guess trial tactics which have a rational basis. *United States v. Limehouse*, 950 F.2d 501, 504 (7th Cir.1991), *cert. denied*, ─── U.S. ───, 112 S.Ct. 1962, 118 L.Ed.2d 563 (1992); *United States v. Dyer*, 784 F.2d 812, 817 (7th Cir.1986). Mr. Stokes' decision to point out that Mr. Booker's "criminal history" involved a single *twenty-year-old* weapons conviction dispelled any inference that Mr. Booker had a long or recent criminal record.

█ Mr. Booker also complains that Mr. Stokes introduced the fact that one of the guns had been previously fired. A defendant made a similar claim in *Crisp v. Duckworth*, 743 F.2d 580, 587 (7th Cir.1984), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985). During cross-examination of a stabbing victim, the defense counsel brought out the fact that the defendant stabbed the victim two more times after he lost consciousness—testimony damaging to the defendant's self defense claim. *Id.* at 587. We held that this piece of evidence "was not sufficiently damaging . . . to shake our confidence in the reliability of the jury's verdict." *Id.* The fact that one of the guns was fired sometime before the defendants were taken into custody is a far more benign piece of evidence than the multiple stabbing testimony. Given the ample amount of evidence introduced at trial that supported the conclusion that Mr. Booker knew the guns and drugs were in the car, we do not believe that there is a reasonable probability that the outcome of Mr. Booker's case would have been different if the jury had not been told that the gun had been fired.

Fourth, Mr. Booker claims that Mr. Stokes abandoned Mr. Booker's presumption of innocence by making certain state-

ments to the jury. Mr. Booker contends that counsel's statement that Mr. Booker deserved the protection of "an awful lot of what goes on in our system," implied that Mr. Booker did not deserve full protection in the criminal justice system. Further, Mr. Booker points to allegedly conflicting statements made by Mr. Stokes. In his opening statement, Mr. Stokes said that he was mad the case went to trial. In his closing statement, Mr. Stokes stated that he thought "this case had to go to trial."

Mr. Booker argues that these statements demonstrated to the jury that Mr. Stokes had changed his mind about the validity of the charges against his client and—in effect—abandoned him. In support of this claim, defendant cites *United States v. Swanson*, 943 F.2d 1070 (9th Cir.1991). This case is easily distinguishable. In *Swanson*, defense counsel told the jury that there was no reasonable doubt as to whether his client robbed the bank. The court concluded that the attorney had abandoned his client at a critical stage in the criminal proceedings. *Id.* at 1074. Mr. Stokes did not tell the jury his client was guilty and his comments do not indicate client abandonment. We do not agree with Mr. Booker's bizarre characterization of Mr. Stokes' comments. The statements by Mr. Stokes may reasonably be read as an affirmation that Mr. Booker should not have been charged—but once charged was entitled to have an impartial jury determine his guilt or innocence. The statements of counsel and the rest of the record do not support a conclusion that Mr. Stokes abandoned his duty to protect Mr. Booker's rights. Mr. Booker has failed to demonstrate a reasonable probability that the outcome of his trial would have been different if these statements had not been made.

 Finally, Mr. Booker contends that because Mr. Stokes failed to move for a judgment of acquittal until after Mr. Blake's counsel made such a motion, Mr. Booker was deprived of effective independent counsel.[6] Mr. Booker's argument is wholly without merit. Mr. Booker was not prejudiced by Mr. Stokes' five minute delay in making the motion. *See United States v. Otero*, 848 F.2d 835, 839 (7th Cir.1988) (defendant not prejudiced by counsel's failure to "properly" raise a motion because trial court did consider it). Moreover, a review of the record demonstrates that Mr. Stokes provided independent counsel to defendant Booker and did not rely solely on his co-counsel throughout the trial.

### III.

Having concluded that none of defendant Booker's complaints resulted in ineffective assistance of counsel, "we must also consider their cumulative effect in light of the totality of the circumstances." *Crisp*, 743 F.2d at 582. We conclude that all the alleged errors together did not operate to deprive Mr. Booker of effective counsel.

The defendants' other arguments do not merit discussion. We AFFIRM the convictions of both Calvin Booker and James Blake.

---

6. Mr. Stokes was late in his motion, stating: "I apologize, your Honor. I meant to do that, too. My brain is getting weak. I'd also wish to make that motion."